O'TOOLE, ADMR., APPELLEE, *v.* DENIHAN ET AL., APPELLANTS.

[Cite as *O'Toole v. Denihan,* 118 Ohio St.3d 374, 2008-Ohio-2574.]

(No. 2007–0056—Submitted February 26, 2008—Decided June 4, 2008.)

O'CONNOR, J.

{¶ 1} In the case before us, we are asked to determine whether appellants Cuyahoga County Department of Children and Family Services ("CCDCFS"), Tallis George–Munro, Kamesha Duncan, and William Denihan are entitled to immunity in their handling of the case of Sydney Sawyer, a child who died from abuse. For the reasons that follow, we hold that they are.

{¶ 2} First, a public children services agency and its employees, upon receipt of a case referral, do not have a duty under R.C. 2151.421(A)(1)(a) to cross-report the case to a law-enforcement agency and are immune from liability for failing to

do so. Second, because R.C. 2919.22(A) does not expressly impose liability on a political subdivision and its employees, immunity applies.

{¶ 3} Finally, recklessness is a perverse disregard of a known risk. Recklessness, therefore, necessarily requires something more than mere negligence. The actor must be conscious that his conduct will in all probability result in injury.

{¶ 4} Accordingly, we reverse the judgment of the court of appeals.

## I. Relevant Background

{¶ 5} The trial court decided this case in appellants' favor by summary judgment. We, therefore, construe the following facts from the record (which include deposition transcripts, affidavits, and the pleadings) in the light most favorable to appellee. *State ex rel. Zimmerman v. Tompkins* (1996), 75 Ohio St.3d 447, 448, 663 N.E.2d 639.

{¶ 6} On the morning of March 29, 2000, CCDCFS received a referral regarding the condition of a minor child, Sydney. The referral came to CCDCFS through the normal hotline procedure.

{¶ 7} The intake supervisor overseeing Sydney's case was Tallis George–Munro. As an intake supervisor, George–Munro was responsible for receiving daily cases from the hotline unit, distributing those cases to the unit social workers, advising those social workers on their handling of the case, and evaluating the cases for either closure or a transfer to ongoing services. An intake supervisor, however, did not follow the cases beyond the initial intake. Only the social workers in the intake unit handled that aspect of the investigation.

{¶ 8} Referrals received from the hotline secretary were triaged and given a rating of priority one, two, or three. A case with a priority-one rating was given immediately to the social worker who was on standby to receive such cases for that day, even if the social worker was a new employee with little training and experience. The standby social worker's responsibility was to investigate cases, which required inquiring into the family situation, identifying resources for the child, and determining whether the case should be closed or transferred. In investigating a priority-one referral, the social worker must leave the agency within one hour of receipt of the case and go to the reporting source or to the child. The social worker would take several forms, including medical releases and letters from CCDCFS to leave at the child's home in case no one was there.

{¶ 9} After the referrals were triaged, George–Munro would assign the cases on a rotational basis. In this instance, Sydney's case was given a priority-one rating because the reporting source indicated that Sydney had a mark on the left side of her head and other marks on her body.

{¶ 10} Shortly before this incident, on March 1, CCDCFS had implemented a new investigative and reporting model called Structured Decision Making

("SDM"). George–Munro received some training in SDM, which included two 45–minute sessions, a full-day training session, and a half-day workshop. He did not, however, attend a four-day session that provided more extensive training on SDM, nor had he or his social workers been tested to ensure that they understood SDM. George–Munro expressed his doubts regarding SDM in November 1999 because he was concerned over how it could be used to adequately predict individual situations. He also was troubled that SDM did not contain a baseline for risk assessment, which was the foundation for CCDCFS's policies.

{¶ 11} Under the SDM model, the social worker on an initial visit must take a safety-assessment form (which addressed the initial home visit), risk-assessment form (addressing future risk), safety-plan form, investigation-and-assessment form ("I & A"), and a police-verification form that would be sent to the police if, after 30 days, the allegation was substantiated.

{¶ 12} On the day Sydney was referred, Kamesha Duncan was the standby social worker for priority-one cases. Duncan had received six to eight priority-one cases since she began accepting cases in January 2000. Although she was still on her six-month probationary period, she had received training in SDM. Despite not being completely familiar with the intake department's policies and procedures, Duncan had filled out safety- and risk-assessment forms in cases prior to March 29, 2000. She did not understand, however, that the safety assessment was to be completed when she interviewed the child.

{¶ 13} Upon assigning Sydney's case to Duncan, George–Munro gave Duncan his camera and told her to go to the daycare where Sydney was located, take pictures of her, speak with the daycare staff regarding the referral, interview Sydney separately from her mother LaShon, and call him after she interviewed Sydney.

{¶ 14} When Duncan arrived at the daycare, the staff told Duncan about the marks on Sydney's face, back, and hands. The staff, however, could not really give any other background information about Sydney because she had been at the center for only two or three weeks.

{¶ 15} Duncan, who was not trained in identifying sources of abuse, photographed all the marks on Sydney. As she interviewed the child, Duncan observed injuries on Sydney's left ear, on the left side of her face, and on her back and hands. Sydney told Duncan that these marks were from a fall. The mark on Sydney's face was circular, and the mark behind the ear was more of a straight line; Duncan also noticed a smaller red mark inside Sydney's ear. Sydney told Duncan that her ear injury was the result of an ear infection. Not suspecting that the mark on her face was a fist mark, Duncan did not question this response or ask Sydney to elaborate.

{¶ 16} The marks on Sydney's back were about three to four inches long. Sydney said she did not know how she received these injuries, and there was nothing about those injuries that made Duncan suspect that they were from physical abuse.

{¶ 17} Duncan suspected, however, that the cause for the injuries on Sydney's hands was abuse. Sydney's palms had circular marks, with skin peeling off. Duncan did not think that Sydney's explanation that she got the burns from hot water while brushing her teeth was plausible.

{¶ 18} Duncan did not notice any other marks, nor did she notice anything unusual about Sydney's gait.

{¶ 19} Sydney further relayed to Duncan that she lived with her mother and "father," who was actually her mother's boyfriend Patrick Frazier, and she did not live with any siblings. Sydney also told Duncan that nobody punished her by hitting her. Although Duncan thought that Sydney may have been lying about the marks on her hands, she stated that she did not suspect that Sydney was being abused.

{¶ 20} Duncan then spoke with Sydney's teacher, the center's nurse, the teacher's assistant, and the daycare director. The nurse, who had reported the suspected abuse, told Duncan that Sydney had told her that the marks on her face were from falling off a sofa, and the hand burns were from hot water while brushing her teeth. The nurse, however, did not ask Sydney about the marks on her back, and the mark in Sydney's inner ear was not apparent to the staff. In addition, the school gave Duncan information regarding Sydney's mother LaShon, where Sydney lived, and the homecare provider who picked her up every day. The daycare did not give any information regarding a father or grandparents, and the only emergency contact number on file was for the homecare provider.

{¶ 21} Duncan next spoke with Nashonda Cundiff, Sydney's homecare provider, over the phone. Cundiff, who was responsible for picking Sydney up from daycare, told Duncan that she did not notice any injuries on Sydney or notice Sydney complaining about any marks or bruises.

{¶ 22} LaShon finally came to the school, and Duncan questioned her about Sydney's injuries. LaShon said that Sydney had had an ear infection (explaining the ear injuries) and eczema (explaining the marks on the back) and had fallen off a bed (which explained the marks on Sydney's face, but which was inconsistent with Sydney's statement). Even though Duncan wondered whether the marks on Sydney's back could be from eczema, Duncan did not think that LaShon was lying.

{¶ 23} LaShon went on to say that she and Sydney lived alone, but Duncan noted that at one point LaShon said, "Then me and my boyfriend talked for a

while and we woke up and went to work. My boyfriend and I take the bus." Although this narrative suggested that Frazier was spending nights at LaShon's home, Duncan did not press her on the inconsistency. In addition, LaShon said that Sydney did not see her biological father.

{¶ 24} When Duncan asked about Sydney's doctors, LaShon said that she took Sydney to see doctors at the Neon Clinic as well as University Hospital. LaShon then willingly signed a release giving Duncan access to Sydney's medical records.

{¶ 25} Duncan proceeded to contact George–Munro and described Sydney's injuries to him. He asked Duncan whether she had interviewed Sydney and LaShon separately; he also went over the safety- and risk-assessment forms with Duncan and told her to work up a safety plan, whose purpose was to reduce the level of risk to Sydney.

{¶ 26} After Duncan consulted with George–Munro in preparing the next steps, she completed the safety plan, which required LaShon to take Sydney to see a doctor and to make the appointment while Duncan was present. George–Munro considered this part key to the safety plan because CCDCFS needed to verify Duncan's conclusion that the injuries were not the result of abuse. The safety plan also required LaShon to report to Duncan the results of the medical visits and to keep Sydney in daycare through the current enrollment period. Further, the daycare staff was to report any injuries, bruises, or questionable marks on Sydney. In addition, Duncan made an appointment with LaShon to visit the home the next day.

{¶ 27} CCDCFS policy did not require Duncan to complete a risk assessment at the site on the day of the incident, nor did she contact anyone else with the county. She did not believe that she had a duty to notify the police of the referral and investigation. In addition, she did not take any steps to contact Frazier or Sydney's biological father. Moreover, CCDCFS did not at that time require its social workers to run any criminal background checks under these circumstances.

{¶ 28} George–Munro then confirmed with LaShon that she had signed the safety plan and understood that she had to take Sydney for medical evaluation. He also spoke with the daycare director and with Duncan. Not having any reason to believe Duncan did not follow his instructions, and with the safety plan in place, George–Munro told Duncan it was okay for LaShon to take Sydney home with her.

{¶ 29} Although it was an available option, George–Munro did not think there was just cause to seek an ex parte order for temporary emergency custody over Sydney, and he was not aware of any procedure by which Sydney could have been taken into custody without initial court intervention. This was based on his

training that visual inspection alone was an insufficient reason to deduce physical abuse. Instead, he was trained to have the injuries verified by a doctor.

{¶ 30} There is some dispute as to when Duncan next met with George–Munro, as she said she met with him that day after getting back, but George–Munro said he did not meet with her until two days later on March 31. In any event, on March 30, Duncan visited LaShon and Sydney's home. As Sydney was at daycare, only LaShon and Frazier were home. Duncan attempted to question Frazier, but he refused to talk to her. During her visit, Duncan saw that there was not much food in the house, and the water could get hot enough to burn if it ran for a while. The house, however, did not have any other hazards; there was no refuse or filth on the floor, there were no protruding nails or wiring, and Sydney had her own, clean bed.

{¶ 31} When George–Munro finally reviewed the case with Duncan, he looked only at the photos of Sydney and the I & A form. As he reviewed these items, LaShon's statements did not jump out at him as inconsistent, but he was aware that they did not adequately explain all the injuries and other marks on Sydney.

{¶ 32} First, with respect to the burns on Sydney's hands, the explanation the child gave seemed plausible to George–Munro, although in hindsight, he acknowledged that it was possible, but not probable, that the burns were intentionally inflicted. Similarly, George–Munro did not think that the marks on Sydney's ears were from someone pulling or yanking them. Nor did he think that the marks on Sydney's back were from whipping or a beating.

{¶ 33} Although George–Munro thought that the explanations for those injuries were plausible, he was concerned about the "non-explanation" for the marks on Sydney's face. The marks on the right were next to her eye by the cheekbone and below her cheek by her jaw; on the left, there were marks above her cheekbone and on her cheek. George–Munro speculated that these marks could have been made by a fist.

{¶ 34} At that time, George–Munro did not review the safety assessment, risk assessment, or safety plan, the last of which Duncan, LaShon, and the nurse at the daycare center signed. In fact, Duncan was to have completed the safety assessment within 24 hours of interviewing Sydney and the other principal parties, but the form was not completed until May 1, which was after Sydney's death. As for the safety plan, George–Munro may not have seen it until April 11, and he never signed off on it. Furthermore, he was concerned that CCDCFS had never received the medical records, but he never talked with Sydney's doctors.

{¶ 35} Notwithstanding the above, George–Munro thought that the safety plan was sufficient because LaShon appeared to be cooperating with CCDCFS. Still, even though he thought that the safety plan required Duncan to have weekly

contact with Sydney, it did not. Moreover, despite the fact that Frazier refused to speak to Duncan, George–Munro did not recall ever instructing Duncan to follow up with Frazier. Finally, although George–Munro believed that a police report had been sent on March 29, one has never been produced, and George–Munro never talked with law enforcement regarding the case.

{¶ 36} George–Munro never saw Sydney himself. He did not make any attempts to contact any of her other relatives, nor did he instruct Duncan to contact the biological father. He did run background checks to see if there were any previous referrals on LaShon and the father for child abuse; the results were negative.

{¶ 37} On March 31, LaShon asked Duncan if she could travel out of state for a family funeral with Sydney. The fact that LaShon asked to leave CCDCFS's jurisdiction so shortly after the home visit raised a red flag with Duncan and George–Munro. George–Munro told Duncan to get the relatives' phone numbers and addresses and LaShon's itinerary, but he did not require her to make a home visit before they left. Duncan, however, never spoke with LaShon again and failed to require any proof of the trip.

{¶ 38} George–Munro subsequently discussed the case with Duncan four or five times between March 31 and April 27. On one of those occasions, George–Munro learned that Duncan had not seen Sydney since the initial investigation, and he instructed her to visit LaShon and Sydney as soon as they returned from the funeral.

{¶ 39} On April 26, George–Munro became aware that Duncan still had not seen Sydney, so he told her to go see her immediately. Duncan went to the daycare, but Sydney was not there because she was on spring break. Duncan could not recall inquiring into Sydney's attendance from March 29 through that day.

{¶ 40} Two days later, at lunchtime on April 28, George–Munro learned that Sydney had died.[1] He had a meeting with his supervisors and Duncan, during which he took responsibility for the decision to keep Sydney with LaShon. William Denihan, the director of CCDCFS, asked both George–Munro and Duncan to write up brief summaries of the case and their involvement.

{¶ 41} George–Munro later had a one-on-one meeting with Denihan on April 30. At that meeting George–Munro expressed remorse over Sydney's death and claimed that he was responsible.

---

1. LaShon was eventually convicted of child endangering, felonious assault, and murder for Sydney's death. See *State v. Sawyer* (Mar. 14, 2002), 8th Dist. No. 79197, 2002 WL 407935. In addition, Frazier pleaded guilty to involuntary manslaughter.

{¶ 42} The case was marked with a final disposition of "substantiated" on May 1, even though there was nothing that tied Sydney's death back to the injuries she had on March 29. George–Munro also had to fill out a fatality report. George–Munro noted that the "child died on April 28th, 2000, per death report, supervisory error regarding safety."

{¶ 43} On October 16, 2001, appellee John K. O'Toole, as the personal representative and administrator of the estate of Sydney Sawyer, filed a wrongful-death suit against CCDCFS and against Denihan, George–Munro, and Duncan, in their individual and official capacities. Appellee argued that appellants were not entitled to immunity because liability was imposed expressly by R.C. 2151.421(A) (failure to report suspected child abuse) and R.C. 2919.22 (child endangering). In addition, appellee maintained that the conduct of CCDCFS's employees was reckless. The trial court eventually granted summary judgment in favor of all appellants on all of appellee's claims.

{¶ 44} An appeal to the Eighth District Court of Appeals followed. The appellate court found that there existed genuine issues of material fact that precluded summary judgment. *O'Toole v. Denihan,* 8th Dist. No. 87476, 2006-Ohio-6022, 2006 WL 3317797. As a result, the court of appeals reversed the judgment of the trial court.

{¶ 45} Appellants appealed to this court, and we initially accepted jurisdictional review only over George–Munro's second proposition of law. 113 Ohio St.3d 1465, 2007-Ohio-1722, 864 N.E.2d 652. Appellants moved for reconsideration, and we granted that motion, thereby extending our jurisdictional review over George–Munro's first proposition of law, and the first, second, and third propositions of the remaining appellants. 114 Ohio St.3d 1429, 2007-Ohio-3063, 868 N.E.2d 681.

## II. Analysis

{¶ 46} The issue before us is whether appellants are entitled to immunity under R.C. Chapter 2744.

{¶ 47} Subject to a few exceptions, R.C. 2744.02(A)(1) provides that political subdivisions are "not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." [2] Likewise, immunity is extended, with three exceptions, to employees of political subdivisions under R.C. 2744.03(A)(6).

---

2. Our precedent regarding the three-tiered analysis to determine a political subdivision's immunity is well settled. See, e.g., *Cramer v. Auglaize Acres,* 113 Ohio St.3d 266, 2007-Ohio-1946, 865 N.E.2d 9, ¶ 14; *Colbert v. Cleveland,* 99 Ohio St.3d 215, 2003-Ohio-3319, 790 N.E.2d 781, ¶ 7. The second prong of that analysis, whether any of the exceptions to immunity apply, is the focus of our inquiry in this case.

{¶ 48} The exceptions to immunity that are relevant in this case are twofold. First, immunity can be lost as to both political subdivisions and their employees when the Revised Code expressly imposes liability. See R.C. 2744.02(B)(5) and 2744.03(A)(6)(c). Second, employees can lose their immunity for acting "with malicious purpose, in bad faith, or in a wanton or reckless manner." R.C. 2744.03(A)(6)(b). We will examine each of these in turn.

## A. Liability Under R.C. 2151.421

{¶ 49} Appellee believes that appellants had a duty to report Sydney's case to local law enforcement. Appellee premises this belief on R.C. 2151.421(A)(1)(a),[3] which at the time read, "No person described in division (A)(1)(b) of this section who is acting in an official or professional capacity and knows or suspects that a child under eighteen years of age * * * has suffered or faces a threat of suffering any physical or mental wound, injury, disability, or condition of a nature that reasonably indicates abuse or neglect of the child, shall fail to immediately report that knowledge or suspicion to the public children services agency or a municipal or county peace officer in the county in which the child resides * * *." 147 Ohio Laws, Part III, 4686, 4697.

{¶ 50} Appellee maintains that the statute requires a public children services agency and its employees to report the referrals it receives to law-enforcement officials. Such an interpretation is tortured and flawed on several fronts.

{¶ 51} First, the statute requires the report to be made "to the public children services agency *or* a municipal *or* county peace officer in the county in which the child resides." (Emphasis added.) The word "or" is primarily used as a disjunctive, and "[c]anons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise * * *." *Reiter v. Sonotone Corp.* (1979), 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931.

{¶ 52} Appellee cites no precedent to support his position that the "or" in this case should not be read in the disjunctive. A disjunctive reading, therefore, leads to the inescapable conclusion that a reporter under the statute has the option to report suspected abuse to either the public children services agency or law enforcement.

{¶ 53} Moreover, this section of the statute does not place an affirmative duty to cross-report on the recipient of the initial report. Instead the duty is on the person who "fail[s] to immediately report that knowledge or suspicion to the public children services agency *or* a municipal or county peace officer." 147 Ohio

---

3. The statute has since been amended, but those amendments do not substantively affect the portions analyzed in this case.

Laws, Part III, 4686, 4697. The statute does not expressly state that once the agency receives that initial report, the agency must then immediately cross-report it to law enforcement. As a result, the fact that a public children services agency receives a report does not trigger any duty to cross-report to law enforcement. Thus, once CCDCFS and the employees received the report, the initial reporter made its selection, and CCDCFS, one of those entities that could receive the report, did not have to then file a cross-report with the police.

{¶ 54} Conversely, the General Assembly was not so silent in setting forth the duties of a peace officer who receives an abuse report. The statute is quite explicit that upon receipt of a report of abuse, law enforcement must refer the report to the agency. See former R.C. 2151.421(D)(1) ("Upon the receipt of a report concerning the possible abuse or neglect of a child * * *, the municipal or county peace officer who receives the report shall refer the report to the appropriate public children services agency"). 147 Ohio Laws, Part III, 4698.

{¶ 55} Similarly, the legislature laid out specific duties and steps that a public children services agency must perform when it receives a report of possible abuse. See former R.C. 2151.421(D)(2) (requiring the agency to comply with R.C. 2151.422, which directed the agency to determine whether the child is living in a shelter, comply with any interagency agreements, and begin its investigation, 147 Ohio Laws, Part III, 4698); see also R.C. 2151.421(F)(2) (requiring the agency to recommend to the county prosecutor or city law director any measures deemed necessary to protect the child). Notably absent from the statute is any duty on the part of an agency and its workers to cross-report referrals immediately to law enforcement.

{¶ 56} Instead, under R.C. 2151.421(F)(1), upon the receipt of a report, the "agency shall submit a report of its investigation, in writing, to the law enforcement agency." To require a cross-report to the police, at a time when the agency has not yet fulfilled its duty to investigate, would result in duplicative investigations and could even be construed as requiring law enforcement to then cross-report back to the agency under R.C. 2151.421(D). Furthermore, if all referrals were cross-reported, children services agencies would have a duty to cross-report referrals that are unsubstantiated. It is presumed that the legislature does not intend absurd results, which is what a duty to cross-report would lead to. *State ex rel. Haines v. Rhodes* (1958), 168 Ohio St. 165, 5 O.O.2d 467, 151 N.E.2d 716, paragraph two of the syllabus (statutes must be construed to prevent absurd results).

{¶ 57} There are other sections of the code that expressly require the agency or law enforcement to cross-report in different situations. "The canon expressio unius est exclusio alterius tells us that the express inclusion of one thing implies the exclusion of the other." *Myers v. Toledo*, 110 Ohio St.3d 218, 2006-Ohio-4353,

852 N.E.2d 1176, ¶ 24. If the legislature had wanted agencies to immediately cross-report to law enforcement, it could have explicitly so stated, just as it did in R.C. 2151.421(D) and (F).

{¶ 58} We have previously recognized that the purpose of the statute is for "children services agencies [to] take responsibility for investigating and proceeding with appropriate action to prevent further child abuse or neglect in specific, individual cases." *Brodie v. Summit Cty. Children Servs. Bd.* (1990), 51 Ohio St.3d 112, 119, 554 N.E.2d 1301. Therefore, based on the language and intent of the statutory scheme as a whole, it cannot be read to require a public children services agency to cross-report to law enforcement.

{¶ 59} In avoiding the plain meaning of the statute, appellee relies heavily on the fact that the statute requires the public children services agency and law enforcement to work in concert in investigating the suspected abuse. See R.C. 2151.421(F)(1). These words cannot be read in a vacuum, but rather must be read in the context of the statute as a whole.

{¶ 60} First, as noted in the preceding paragraphs, the statute does not place any explicit, affirmative cross-reporting duty on the agency. Second, we previously have recognized that although there is to be cooperation between these two entities, " '[t]he thrust of R.C. 2151.421 is directed to the [public] children services [agencies].' " *State ex rel. Strothers v. Wertheim* (1997), 80 Ohio St.3d 155, 157, 684 N.E.2d 1239, quoting *State ex rel. Munici v. Kovacic* (June 15, 1994), 8th Dist. No. 64818, 1994 WL 264265. " 'In fact, the local peace officers are required to refer the incident of child abuse to the social service agency, which then has the responsibility to investigate.' " *State ex rel. Beacon Journal Publishing Co. v. Akron,* 104 Ohio St.3d 399, 2004-Ohio-6557, 819 N.E.2d 1087, ¶ 39, quoting *Munici.* Thus, ultimately, "[i]t is the responsibility of * * * children services [agencies] to investigate allegations of child abuse and neglect * * *." *Strothers,* 80 Ohio St.3d at 157, 684 N.E.2d 1239.

{¶ 61} Thus, as a matter of law, appellants did not violate R.C. 2151.421(A)(1)(a). As there was no duty for appellants to cross-report, it is immaterial with respect to this particular statute that there is a question of fact whether appellants reported Sydney's case to the police. Because there was no duty violated, there is no exception to immunity. The court of appeals erred, therefore, in holding that appellants were not entitled to immunity as to this issue.

## B. Liability Under R.C. 2919.22

{¶ 62} Appellee further contends that appellants forfeited immunity by violating R.C. 2919.22, Ohio's criminal child-endangering statute.

{¶ 63} In analyzing the issue, again we must first look to the text itself. The relevant portion of the statute reads, "No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support." R.C. 2919.22(A).

{¶ 64} Our recent holding in *Cramer v. Auglaize Acres*, 113 Ohio St.3d 266, 2007-Ohio-1946, 865 N.E.2d 9, illuminates the analysis in this instance. In *Cramer*, the administrator of the estate of a deceased resident of a county nursing home brought suit against the home, nurses, and county commissioners.

{¶ 65} The trial court held that R.C. 3721.17(I)(1)(a) created a cause of action against the nurses. Id. at ¶ 5. That code section provides, "Any resident whose rights under sections 3721.10 to 3721.17 of the Revised Code are violated has a cause of action against any person or home committing the violation." For purposes of the statute, the General Assembly included in the definition of "home" a "county home or district home operated pursuant to Chapter 5155. of the Revised Code." R.C. 3721.10(A)(3). *Cramer* held that "[t]he General Assembly specifically included county homes operated pursuant to R.C. Chapter 5155 within its definition of the 'homes' that can be sued and thus specifically imposed liability on county-operated homes for any violation of the Patients' Bill of Rights." Id., 113 Ohio St.3d 266, 2007-Ohio-1946, 865 N.E.2d 9, ¶ 30.

{¶ 66} With respect to the nurses sued in *Cramer*, however, we noted that the legislature did not define "person" for purposes of the Patients' Bill of Rights, R.C. 3721.10 through 3721.17. Id. at ¶ 32. We agreed with the court of appeals that the term "person" in R.C. 3721.17(I)(1) was too general to expressly impose liability on an employee of a political subdivision. Id. at ¶ 32. As a result, the employees of the county nursing home were entitled to immunity.

{¶ 67} Similar to the statutes at issue in *Cramer*, R.C. 2919.22 uses the word "person" without any reference to political subdivisions or their employees. There is no indication whatsoever in the language of R.C. 2919.22 that the General Assembly has abrogated the immunity provided to political subdivisions and their employees with an express imposition of liability. Again, if the General Assembly had wanted to specifically include employees of public children services agencies among the list of people potentially liable, it could have done so. Without any express imposition of liability, appellants are entitled to immunity.

{¶ 68} Although appellee attempts to obfuscate the issue by focusing on the duty imposed on the listed persons in R.C. 2919.22, the argument lacks a legal basis. Assuming arguendo that R.C. 2919.22 even imposes a duty on political subdivisions and its employees, our precedent demonstrates quite clearly that the imposition of a duty does not equate to the required express imposition of liability

for failure to perform the duty. *Butler v. Jordan* (2001), 92 Ohio St.3d 354, 357, 750 N.E.2d 554.

{¶ 69} Given the foregoing discussion, R.C. 2919.22 does not impose liability upon appellants, and, as a result, they are entitled to immunity.

## C. Reckless Conduct

{¶ 70} Finally, we are asked to determine whether George–Munro and CCDCFS can be held liable for reckless conduct.

{¶ 71} Initially, we note that because there is no liability under R.C. 2151.421 and 2919.22, CCDCFS is immune from liability in this case. As our jurisprudence in the area of immunity has made clear, a political subdivision's immunity can be removed only through one of the enumerated exceptions found in R.C. 2744.02(B)(1) through (5). *Colbert v. Cleveland,* 99 Ohio St.3d 215, 2003-Ohio-3319, 790 N.E.2d 781, ¶ 8. As appellee relied solely on R.C. 2744.02(B)(5), which has been shown to be inapplicable, and as none of the other exceptions apply, CCDCFS retains its immunity. It is not necessary, therefore, to advance to the third tier of analysis as it pertains to CCDCFS.

{¶ 72} As for George–Munro, although he is not stripped of his immunity under R.C. 2744.03(A)(6)(c), we must determine whether he can be liable under R.C. 2744.03(A)(6)(b). This exception to employee immunity attaches liability where "[t]he employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner."

{¶ 73} In *Thompson v. McNeill* (1990), 53 Ohio St.3d 102, 559 N.E.2d 705, we held that an actor's conduct " 'is in reckless disregard of the safety of others if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.' " Id. at 104–105, 559 N.E.2d 705, quoting 2 Restatement of the Law 2d, Torts (1965) 587, Section 500. Distilled to its essence, and in the context of R.C. 2744.03(A)(6)(b), recklessness is a perverse disregard of a known risk. Cf. *Fabrey v. McDonald Village Police Dept.* (1994), 70 Ohio St.3d 351, 356, 639 N.E.2d 31; see also *McGuire v. Lovell* (1999), 85 Ohio St.3d 1216, 1219, 709 N.E.2d 841 (Moyer, C.J., dissenting); *Jackson v. Butler Cty. Bd. of Cty. Commrs.* (1991), 76 Ohio App.3d 448, 454, 602 N.E.2d 363 ("we recently held that the term 'reckless' as used in R.C. 2744.03(A)(6)(b) means a perverse disregard of a known risk").

{¶ 74} Recklessness, therefore, necessarily requires something more than mere negligence. *Fabrey,* 70 Ohio St.3d at 356, 639 N.E.2d 31. In fact, "the actor must be conscious that his conduct will in all probability result in injury." Id.

{¶ 75} Although the determination of recklessness is typically within the province of the jury, the standard for showing recklessness is high, so summary judgment can be appropriate in those instances where the individual's conduct does not demonstrate a disposition to perversity.  Id.

{¶ 76} Although Sydney's death was tragic, that tragedy does not mean that the burden for showing recklessness is any different in this case.  We must apply the law without consideration of emotional ramifications and without the benefit of 20–20 hindsight.  In construing the facts most strongly in favor of appellee, we conclude that George–Munro's conduct does not rise to the level of recklessness.  In investigating the matter, George–Munro could act and react based only on the information provided to him by Duncan.  Although Duncan may have failed to complete some paperwork, a safety plan had been established and agreed to by all interested parties.  Furthermore, in his review of the evidence shortly after Duncan's initial investigation, only the marks on Sydney's face and the explanation for those marks aroused his suspicions.  Nevertheless, given the fact that the safety plan was in place, that the home was clean and free of any hazards, that the background check on LaShon came back negative, and that LaShon appeared to be cooperating with appellants, George–Munro did not feel that he had any grounds to remove Sydney from the home.

{¶ 77} Despite these facts, the court of appeals confoundingly determined without any support from that record that on the issue of recklessness, there were genuine issues of material facts insofar as "the agency already knew that someone had injured [Sydney] and still returned the child to her mother, even though she had a long history of abusing her children," *O'Toole,* 2006-Ohio-6022, ¶ 19.  The appellate court characterized Munro's and Duncan's failure to protect Sydney and their failure to investigate Sydney's abuse as reckless.  Id. at ¶ 22.

{¶ 78} The record, however, belies these conclusions.  First, as already noted, George–Munro did not, and could not, automatically reach the conclusion that Sydney was being abused.  Second, there is nothing in the record to show that Sydney's mother "had a long history of abusing her children."  Although it is tempting to employ hindsight to blame George–Munro, as he himself did on the day he learned of Sydney's death, there is no evidence that George–Munro consciously left Sydney in the home with the knowledge that further injury was a substantial certainty.

{¶ 79} *Grimm v. Summit Cty. Children Servs. Bd.,* 9th Dist. No. 22702, 2006-Ohio-2411, 2006 WL 1329689, helps to illustrate the difference between recklessness and mere negligence, two distinct mental states that the court of appeals in this case seemed to conflate.  In *Grimm,* the plaintiff brought suit against a number of different defendants, including the employees of the county children services board.  The minor plaintiff, who had been raped by her stepfather, was

interviewed by the children services board while in the hospital to deliver the child conceived as a result of the rape. In her complaint, the plaintiff claimed that the children services board, based on that interview, failed in its duty to investigate and protect her from further abuse by her stepfather.

{¶ 80} When the CSB employee began to interview the plaintiff, the plaintiff's mother and stepfather were present. The CSB employee instructed them to leave the room, and they did so without any problems. In response to questioning, the plaintiff then denied that the stepfather "had inappropriately touched her, that she had ever undressed or been naked in front of [him], or that [he] had ever physically examined her during her pregnancy or labor. Additionally, [she] readily stated that her mother was her best friend and that [the stepfather] was good to her. Based on those facts, [the CSB employee] concluded that there was no imminent danger in releasing [her], but recommended follow-up by CSB." Id. at ¶ 77.

{¶ 81} In holding that the CSB supervisor was not reckless and thus not liable, the court of appeals noted that the evidence showed that the plaintiff denied any wrongdoing by the stepfather and showed no reluctance to go home with him. "[A] social worker needs facts to convince the police or a court to remove a child from the care of its family." No such facts were obtained. Id. at ¶ 79.

{¶ 82} Further illustrating the point that George–Munro's conduct was not reckless is the decision in *Jackson*, 76 Ohio App.3d 448, 602 N.E.2d 363. In *Jackson*, the Butler County Department of Human Services ("BCDHS") had removed Tiffany Hubbard and her two younger brothers from their mother's home. One of Tiffany's brothers had been found with "deep scratches and bruises." Id. at 451, 602 N.E.2d 363. BCDHS later formulated a plan to reunite the children with their mother and father, who were unmarried and not living together at the time. Id.

{¶ 83} The juvenile court approved the plan and set a hearing. In the interim, and in accordance with the trial court's suggestion, BCDHS decided to place the children temporarily with the father.

{¶ 84} At the hearing, BCDHS told the juvenile court that the children's placement in the father's home "appeared to be satisfactory." Id. The court terminated BCDHS's custody, placed the children in the father's temporary custody, and ordered BCDHS to "maintain its protective supervision of the children's placement." Id.

{¶ 85} Over the following month, BCDHS visited the home once, but did not see Tiffany. In fact, no BCDHS employee had seen Tiffany since three weeks before the hearing. And unfortunately, that visit turned out to be the last time anyone at BCDHS would see Tiffany alive, as she was found dead about a month later. Her father had beaten her to death.

{¶ 86} Tiffany's mother filed suit against a number of defendants, including several BCDHS employees responsible for supervising Tiffany's placement. In arguing that these employees were reckless, the mother relied heavily on a written evaluation from the Children's Diagnostic Center. The mother argued that the "report [was] replete with warnings that it would be dangerous to place Tiffany in the custody of her father." Id., 76 Ohio App.3d at 455, 602 N.E.2d 363. The appellate court, however, wrote that despite the fact that "the report classifie[d] [the father] in less than idealistic terms, * * * cases such as the one currently under consideration deal 'with less than an ideal environment.'" Id., quoting the trial court's opinion.

{¶ 87} In addition, the mother alleged that the "failure to see Tiffany on a face-to-face basis reflect[ed] a 'reckless' attitude and failure to adequately supervise * * * since there was evidence that Tiffany's injuries were inflicted weeks before her death." Id. Again, the court of appeals did not conclude that the conduct rose to the level of recklessness, and it agreed with the trial court's astute observation that "'[a] social homeworker cannot be everywhere at all times and everything to everybody. * * * The fact that Tiffany died and that it could have been prevented with more vigilance on behalf of [BCDHS] does not equate with negligence, let alone recklessness. The department is not an insurer of its clients.'" Id., 76 Ohio App.3d at 455, 602 N.E.2d 363.

{¶ 88} Conversely, in C.S. Hahn v. Wayne Cty. Children Servs. (May 9, 2001), 9th Dist. No. 00CA0029, 2001 WL 489959, the court of appeals determined that the defendant's conduct constituted recklessness. In that case, the Hahns agreed to provide foster care for a 12–year–old child, who then sexually assaulted the Hahns' seven-year-old son.

{¶ 89} The evidence in Hahn revealed that the agency's employees "knowingly placed a foster child with a history of sexually abusing younger children with first-time foster parents who had young children, without warning the family about the foster child's deviant sexual behavior." Id. at *5.

{¶ 90} The facts in Hahn clearly show what constitutes a perverse disregard of a known risk. Given those facts, harm to the Hahns' children was substantially certain to occur.

{¶ 91} In the case before us, however, George–Munro's conduct more closely resembles that of the agency employees in Grimm and Jackson. Sydney had told Duncan that no one punished her by hitting her. LaShon appeared to be cooperating with CCDCFS, and her statements did not seem inconsistent. George–Munro's training was such that abuse had to be verified by a doctor. In addition, he was acting under the assumption that Duncan was following his directives. In short, George–Munro thought that the safety plan was sufficient to protect Sydney from future harm. Furthermore, as discussed previously,

George–Munro did not think he could seek an ex parte order for temporary emergency custody, nor was he aware of how he could have taken Sydney into custody without any court intervention based on the evidence.

{¶ 92} Appellee's final attempt to maneuver around George–Munro's immunity status is based on the allegation that George–Munro violated various Ohio Administrative Code and CCDCFS policies regarding investigations. Given our definition of "recklessness," a violation of various policies does not rise to the level of reckless conduct unless a claimant can establish that the violator acted with a perverse disregard of the risk. See *Shalkhauser v. Medina* (2002), 148 Ohio App.3d 41, 51, 772 N.E.2d 129 ("Nor does appellant's contention that appellees violated the police department's fresh-pursuit policy create an issue of fact for a jury in this case; a violation of an internal departmental procedure is irrelevant to the issue of whether appellees' conduct constituted willful or wanton misconduct"). Without evidence of an accompanying knowledge that the violations "will in all probability result in injury," *Fabrey*, 70 Ohio St.3d at 356, 639 N.E.2d 31, evidence that policies have been violated demonstrates negligence at best. Because the issue here is George–Munro's recklessness, and the record reflects that George–Munro did not perversely ignore the risk, the violations do not create a genuine issue of material fact regarding this issue of recklessness.

### D. Constitutionality of R.C. Chapter 2744

{¶ 93} Although he did not appeal to this court, appellee did challenge the constitutionality of the immunity statutes in his second assignment of error at the court of appeals, and he raises that argument in his merit brief.

{¶ 94} We have held that "assignments of error of an appellee who has not appealed from a judgment may be considered by a reviewing court only to prevent 'a reversal of the judgment under review. * * * [A]n assignment of error by an appellee, where such appellee has not filed any notice of appeal from the judgment * * *, may be used by the appellee as a shield to protect the judgment of the lower court but may not be used by the appellee as a sword to destroy or modify that judgment.'" *Glidden Co. v. Lumbermens Mut. Cas. Co.*, 112 Ohio St.3d 470, 2006-Ohio-6553, 861 N.E.2d 109, ¶ 31–32, quoting *Parton v. Weilnau* (1959), 169 Ohio St. 145, 170–171, 8 O.O.2d 134, 158 N.E.2d 719. If R.C. Chapter 2744 were to be held unconstitutional, this would preserve the judgment of the court of appeals and is certainly "the 'shield' envisioned in *Parton*." *Glidden* at ¶ 35.

{¶ 95} In reviewing our precedent and that of numerous appellate courts, we conclude that this issue is one that is settled and need not be discussed any further in this case. Cf. *Fahnbulleh v. Strahan* (1995), 73 Ohio St.3d 666, 653 N.E.2d 1186; *Fabrey*, 70 Ohio St.3d 351, 639 N.E.2d 31; *Bundy v. Five Rivers*

*Metroparks,* 152 Ohio App.3d 426, 2003-Ohio-1766, 787 N.E.2d 1279, ¶ 45–47. Appellee's challenge, therefore, fails.

### III.  Conclusion

{¶ 96} Sydney's death was tragic; of that there is no doubt.  A life was cut short, and appellants are surely haunted by questions of "what if?"  But "[t]he removal of a child from its current care giver * * * is a painful and contentious event.  Emotions are high and people are vulnerable." *Sobiski v. Cuyahoga Cty. Dept. of Children & Family Servs.,* 8th Dist. No. 84086, 2004-Ohio-6108, ¶ 39. Based on the evidence that George–Munro had before him at the time, we cannot interject our judgment in hindsight and determine what George–Munro should have done.  The applicable legal standard in this case is recklessness, not negligence.

{¶ 97} The law, therefore, does not provide for a recovery here, as the statutes appellee relies upon do not impose either liability or a duty, and George–Munro's conduct, although perhaps negligent, does not rise to the level of recklessness.

{¶ 98} We reverse the judgment of the court of appeals as to whether appellants were stripped of immunity for violations of R.C. 2151.421 and 2919.22. We further reverse the appellate judgment as to whether there were genuine issues of material fact regarding whether or not George–Munro's conduct was reckless.  The cause is remanded to the trial court for proceedings consistent with this opinion.[4]

Judgment reversed
and cause remanded.

MOYER, C.J., and LUNDBERG STRATTON, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

PFEIFER, J., concurs in part and dissents in part.

———————

**PFEIFER, J., concurring in part and dissenting in part.**

{¶ 99} I concur in paragraph one of the syllabus and the portion of the majority opinion that discusses it.

{¶ 100} Because I continue to believe that the doctrine of sovereign immunity violates the Constitution of Ohio, I dissent from the remainder of the majority opinion.  Section 16, Article I of the Ohio Constitution ("every person, for an

———————

4. Our review of the proceedings suggests that the only issues remaining are whether Denihan engaged in reckless policymaking and implementation and whether Denihan and Duncan were reckless in investigating Sydney's case.

injury done him * * *, shall have remedy by due course of law"). See *Garrett v. Sandusky* (1994), 68 Ohio St.3d 139, 141–144, 624 N.E.2d 704 (Pfeifer, J., concurring); *Elston v. Howland Local Schools,* 113 Ohio St.3d 314, 2007-Ohio-2070, 865 N.E.2d 845, ¶ 35 (Pfeifer, J., dissenting).

————————

Wuliger, Fadel & Beyer, William D. Beyer, and Joan E. Pettinelli; and John W. Martin Co. & Assoc., L.P.A., John W. Martin, and Andy Petropouleas, for appellee.

Reminger & Reminger Co., L.P.A., David Ross, and Michelle J. Sheehan, for appellants Cuyahoga County Department of Children and Family Services, William Denihan, and Kamesha Duncan.

William D. Mason, Cuyahoga County Prosecuting Attorney, and James C. Cochran, Assistant Prosecuting Attorney, for appellant Tallis George–Munro.

Isaac, Brant, Ledman & Teetor, L.L.P., and J. Eric Holloway, urging reversal for amicus curiae, Public Children Services Association of Ohio.

RANKIN ET AL., APPELLEES, *v.* CUYAHOGA COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES ET AL., APPELLANTS.

[Cite as *Rankin v. Cuyahoga Cty. Dept. of Children & Family Servs.,* 118 Ohio St.3d 392, 2008-Ohio-2567.]

(No. 2007–0306—Submitted February 5, 2008—Decided June 4, 2008.)

**MOYER, C.J.**

{¶ 1} Appellants, Cuyahoga County Department of Children and Family Services, its director, James McCafferty, and its employee, Gina Zazzara, appeal from a judgment of the Court of Appeals for Cuyahoga County, that reversed the trial court's grant of summary judgment in their favor. For the following reasons, we reverse in part and affirm in part the judgment of the court of appeals.

{¶ 2} The facts of this case are troubling. D.M., a minor child, was committed to the temporary custody of the Cuyahoga Department of Children and Family Services pursuant to an order of the Cuyahoga County Court of Common Pleas. *In re D.M.* (Apr. 23, 2003), Cuyahoga C.P. No. 03900057. While D.M. was in the department's custody, D.M.'s father, Andre Martin, was permitted to have limited, supervised visits with D.M. at the Jane Edna Hunter Social Service Center. During one of Martin's supervised visitation sessions, Martin allegedly sexually assaulted D.M. Martin was indicted in connection with this alleged assault and pleaded guilty to a charge of gross sexual imposition and stipulated that he is a sexually oriented offender. *State v. Martin* (Oct. 21, 2003), Cuyahoga C.P. No. CR441511.

{¶ 3} Appellees, D.M.'s mother, as mother and next friend of D.M., and D.M.'s maternal grandmother, as guardian, filed a civil complaint against the appellants, alleging that appellants had breached the duty they owed to D.M. by failing to protect her from Martin's sexual abuse during the supervised visit at the center. The trial court granted appellants' motion for summary judgment, which had argued that pursuant to R.C. Chapter 2744, they were immune from liability.

{¶ 4} The court of appeals reversed the trial court judgment, holding that there were genuine issues of material fact pertaining to the liability of all appellants.

{¶ 5} The court of appeals determined that the "special relationship" exception discussed in *Sawicki v. Ottawa Hills* (1988), 37 Ohio St.3d 222, 525 N.E.2d 468, creates an issue of fact regarding the immunity of a political subdivision from civil liability. *Rankin v. Cuyahoga Cty. Dept. of Children & Family Servs.*, Cuyahoga App. No. 86620, 2006-Ohio-6759, 2006 WL 3743728, ¶ 22.

{¶ 6} With respect to appellants McCafferty and Zazzara, the court of appeals held that reasonable minds could conclude that McCafferty and Zazzara had acted recklessly when they permitted the supervised visit between D.M. and her father to be conducted in such a manner that Martin was able to sexually assault his daughter during the visit. Id. at ¶ 28. The court determined that under R.C. 2744.03(A)(6)(b), if an individual's actions are proven to be conducted in a reckless manner, then individual immunity no longer applies. *Rankin* at ¶ 27. The cause is before us upon our acceptance of a discretionary appeal.

{¶ 7} The first question presented by appellants concerns the liability of the Cuyahoga County Department of Children and Family Services. The court of appeals concluded that the common-law special-relationship exception to a political subdivision's immunity granted pursuant to R.C. 2744.02(A)(1) may authorize a lawsuit to proceed. We hold that the exception does not apply.

{¶ 8} R.C. Chapter 2744 directs our analysis. "In *Cater v. Cleveland* (1998), 83 Ohio St.3d 24, 28, 697 N.E.2d 610, this court noted that the Political Subdivision Tort Liability Act, codified in R.C. Chapter 2744, sets forth a three-tiered analysis for determining whether a political subdivision is immune from liability for injury or loss to property." *Hortman v. Miamisburg*, 110 Ohio St.3d 194, 2006-Ohio-4251, 852 N.E.2d 716, ¶ 9. Before determining whether a political subdivision is entitled to immunity from a civil action, a court must determine whether the political subdivision was engaged in a governmental or proprietary function when the alleged tort occurred. See R.C. 2744.02(A)(1). R.C. 2744.01 defines "governmental function":

{¶ 9} "(C)(1) 'Governmental function' means a function of a political subdivision that is specified in division (C)(2) of this section or that satisfies any of the following:

{¶ 10} " * * *

{¶ 11} "(2) A 'governmental function' includes, but is not limited to, the following:

{¶ 12} " * * *

{¶ 13} "(m) The operation of a job and family services department or agency, including, but not limited to, the provision of assistance to aged and infirm persons and to persons who are indigent.

{¶ 14} " * * *

{¶ 15} "(o) The operation of mental health facilities, mental retardation or developmental disabilities facilities, alcohol treatment and control centers, and children's homes or agencies."

{¶ 16} Under either R.C. 2744.01(C)(2)(m) or (o), Cuyahoga County Department of Children and Family Services is a political subdivision performing a governmental function. We next apply the three-tiered analysis provided in R.C. Chapter 2744 to determine whether the department may be held liable in a civil action for injury.

{¶ 17} The first tier of the analysis provides that political subdivisions are generally not liable in damages for causing the personal injuries or death of a person. R.C. 2744.02(A)(1) states: "For the purposes of this chapter, the functions of political subdivisions are hereby classified as governmental functions and proprietary functions. Except as provided in division (B) of this section, a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." [1]

{¶ 18} " 'The immunity afforded a political subdivision in R.C. 2744.02(A)(1) is not absolute, but is, by its express terms, subject to the five exceptions to immunity listed in * * * R.C. 2744.02(B). * * * Thus, once immunity is established under R.C. 2744.02(A)(1), the second tier of analysis is whether any of the five exceptions to immunity in subsection (B) apply.' " *Hortman,* 110 Ohio St.3d 194, 2006-Ohio-4251, 852 N.E.2d 716, ¶ 12, quoting *Cater,* 83 Ohio St.3d at 28, 697 N.E.2d 610.

{¶ 19} R.C. 2744.02 provides:

{¶ 20} "(B) Subject to sections 2744.03 and 2744.05 of the Revised Code, a political subdivision is liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by an act or omission of the political subdivision or of any of its employees in connection with a governmental or proprietary function, as follows:

{¶ 21} "(1) Except as otherwise provided * * *, political subdivisions are liable for injury, death, or loss to person or property caused by the negligent operation of any motor vehicle by their employees when the employees are engaged within the scope of their employment and authority. The following are full defenses to that liability:

{¶ 22} " * * *

---

1. We note that while R.C. 2744.02(A)(1) is regularly understood to grant immunity to political subdivisions, the statute does not expressly confer immunity that excuses tort liability but, rather, denies liability generally.

{¶ 23} "(2) Except as otherwise provided * * *, political subdivisions are liable for injury, death, or loss to person or property caused by the negligent performance of acts by their employees with respect to proprietary functions of the political subdivisions.

{¶ 24} "(3) Except as otherwise provided * * *, political subdivisions are liable for injury, death, or loss to person or property caused by their negligent failure to keep public roads in repair and other negligent failure to remove obstructions from public roads * * *.

{¶ 25} "(4) Except as otherwise provided * * *, political subdivisions are liable for injury, death, or loss to person or property that is caused by the negligence of their employees and that occurs within or on the grounds of, and is due to physical defects within or on the grounds of, buildings that are used in connection with the performance of a governmental function * * *.

{¶ 26} "(5) * * * [A] political subdivision is liable for injury, death, or loss to person or property when civil liability is expressly imposed upon the political subdivision by a section of the Revised Code * * *. Civil liability shall not be construed to exist under another section of the Revised Code merely because that section imposes a responsibility or mandatory duty upon a political subdivision, because that section provides for a criminal penalty, because of a general authorization in that section that a political subdivision may sue and be sued, or because that section uses the term 'shall' in a provision pertaining to a political subdivision."

{¶ 27} " 'Finally, under the third tier of analysis, immunity can be reinstated if the political subdivision can successfully argue that any of the defenses contained in R.C. 2744.03 applies.' " *Hortman*, 110 Ohio St.3d 194, 2006-Ohio-4251, 852 N.E.2d 716, ¶ 12, quoting *Cater*, 83 Ohio St.3d at 28, 697 N.E.2d 610.

{¶ 28} Applying the three-tiered analysis, we conclude that the department cannot be held liable for appellees' injuries. Pursuant to R.C. 2744.02(A)(1), the department cannot be subjected to liability for D.M.'s injuries unless one of the exceptions provided in R.C. 2744.02(B) applies to the case.

{¶ 29} R.C. 2744.02(B) lists five exceptions to the general denial of liability; however, none of the exceptions applies to these facts. The injuries in this case did not involve the operation of a motor vehicle (R.C. 2744.02(B)(1)), a proprietary function (R.C. 2744.02(B)(2)), public roads (R.C. 2744.02(B)(3)), physical defects of a building (R.C. 2744.02(B)(4)), or a duty expressly imposed on appellants by statute (R.C. 2744.02(B)(5)). As a result, the general denial of liability granted in R.C. 2744.02(A) applies to the department, and the court of appeals erred when it reversed the summary judgment for the appellant department.

{¶ 30} The court of appeals specifically erred in considering an exception to immunity not provided in R.C. 2744.02(B). "[A]n unambiguous statute must be applied in a manner consistent with the plain meaning of the statutory language." *Hubbell v. Xenia*, 115 Ohio St.3d 77, 2007-Ohio-4839, 873 N.E.2d 878, ¶ 11, citing *State ex rel. Burrows v. Indus. Comm.* (1997), 78 Ohio St.3d 78, 81, 676 N.E.2d 519. Here, R.C. 2744.02 begins with an express general denial of liability, limited only by the exceptions provided in division (B) of the statute: *"Except as provided in division (B) of this section,* a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property * * *." (Emphasis added.)

{¶ 31} The court of appeals began its analysis with R.C. 2744.02(A)(1) and noted that the statute "confers on all political subdivisions a blanket immunity." *Rankin,* 2006-Ohio-6759, 2006 WL 3743728, ¶ 21. Next, however, the court evoked the special-relationship exception to the public-duty rule. The court stated: "Under the special relationship exception, 'a political subdivision may be liable for damages if it can be shown that a "special relationship" existed between the political subdivision and the injured party thereby imposing a "special duty" under the law.'" Id. at ¶ 22, quoting *State Auto Mut. Ins. Co. v. Titanium Metals Corp.*, 159 Ohio App.3d 338, 2004-Ohio-6618, 823 N.E.2d 934, ¶ 14 (reversed on other grounds, 108 Ohio St.3d 540, 2006-Ohio-1713, 844 N.E.2d 1199). This statement was in error, as the special-relationship exception is not codified in R.C. 2744.02(B), and it is therefore not an independent exception to a political subdivision's general immunity from liability.

{¶ 32} We need not go further in our immunity analysis, as R.C. 2744.02(A) prohibits the appellees' claim against the department, and there is no exception in R.C. 2744.02(B) that permits the claim to be resurrected. The special-relationship exception is an exception to the public-duty rule. The public-duty rule is relevant in the determination of whether a defendant owes a legal duty to a plaintiff, but duty is only one element in a claim for negligence. While the public-duty rule and special-relationship exception might be relevant in establishing a claim, these common-law doctrines are irrelevant to a claim against a political subdivision unless the claim is permitted under R.C. 2744.02.

{¶ 33} While the facts here are troubling, the law is clear that R.C. Chapter 2744 does not permit such a claim to be brought against the county. Therefore, we are bound to apply the statute as it is written.

{¶ 34} As we stated recently, " 'Judicial policy preferences may not be used to override valid legislative enactments, for the General Assembly should be the final arbiter of public policy.'" *Hubbell,* 115 Ohio St.3d 77, 2007-Ohio-4839, 873 N.E.2d 878, ¶ 22, quoting *State v. Smorgala* (1990), 50 Ohio St.3d 222, 223, 553 N.E.2d 672. "In *Wilson v. Stark Cty. Dept. of Human Servs.* (1994), 70 Ohio

St.3d 450, 639 N.E.2d 105, this court noted that R.C. Chapter 2744 was the General Assembly's response to the judicial abrogation of common-law sovereign immunity and that '[t]he manifest statutory purpose of R.C. Chapter 2744 is the preservation of the fiscal integrity of political subdivisions.' Id. at 453, 639 N.E.2d 105." *Hubbell* at ¶ 23.

{¶ 35} The second question that appellants present is whether the court of appeals erred in reversing the trial court's grant of summary judgment to appellants McCafferty and Zazzara. The court of appeals held that issues of fact existed as to whether McCafferty and Zazzara acted "in a * * * reckless manner" on the day D.M. was sexually abused by her father during their supervised visit at the center. R.C. 2744.03(A)(6)(b). The court of appeals reversed the trial court and remanded the issue for further consideration.

{¶ 36} "For the individual employees of political subdivisions, the analysis of immunity differs. Instead of the three-tiered analysis * * *, R.C. 2744.03(A)(6) states that an employee is immune from liability unless the employee's actions or omissions are manifestly outside the scope of employment or the employee's official responsibilities, the employee's acts or omissions were malicious, in bad faith, or wanton or reckless, or liability is expressly imposed upon the employee by a section of the Revised Code." *Cramer v. Auglaize Acres,* 113 Ohio St.3d 266, 2007-Ohio-1946, 865 N.E.2d 9, ¶ 17. At issue here is whether McCafferty's and Zazzara's general immunity from liability for injury established in R.C. 2744.03(A)(6) is abolished pursuant to the following exception to employee immunity from liability: "The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." R.C. 2744.03(A)(6)(b).

{¶ 37} We note that showing recklessness is subject to a high standard. "This court has defined the term 'reckless' to mean that the conduct was committed ' "knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent." ' " *Cater,* 83 Ohio St.3d at 33, 697 N.E.2d 610, quoting *Marchetti v. Kalish* (1990), 53 Ohio St.3d 95, 96, 559 N.E.2d 699, fn. 2, quoting 2 Restatement of the Law 2d, Torts (1965) 587, Section 500. " '[M]ere negligence is not converted into wanton misconduct unless the evidence establishes a disposition to perversity on the part of the tortfeasor.' Such perversity must be under such conditions that the actor must be conscious that his conduct will in all probability result in injury." *Fabrey v. McDonald Village Police Dept.* (1994), 70 Ohio St.3d 351, 356, 639 N.E.2d 31, quoting *Roszman v. Sammett* (1971), 26 Ohio St.2d 94, 96–97, 55 O.O.2d 165, 269 N.E.2d 420.

{¶ 38} Although the court of appeals recited a standard of recklessness that is consistent with our decisions, we are not convinced that the record supports the

court's conclusion that "reasonable minds could conclude that these two individuals acted in a reckless manner in allowing these 'supervised' visits between Martin and D.M. to be conducted as they were." *Rankin,* 2006-Ohio-6759, 2006 WL 3743728, ¶ 28. The record before us is incomplete as to whether genuine issues of material fact exist regarding McCafferty's and Zazzara's alleged reckless conduct. Thus, we affirm the decision of the court of appeals to remand this cause to the trial court for further proceedings regarding what involvement, if any, McCafferty and Zazzara had in the supervised visit that occurred between D.M. and Martin.

{¶ 39} In conclusion, in response to appellants' first question, we hold that a political subdivision is not liable for damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission in connection with its operation of a public children services agency except as provided in R.C. 2744.02(B). We therefore affirm in part and reverse in part the judgment of the court of appeals.

Judgment affirmed in part
and reversed in part.

---

Levin Associates Co., L.P.A., Joel Levin, and Christopher M. Vlasich; and James A. Gay, for appellees.

William Mason, Cuyahoga County Prosecuting Attorney, and Shawn M. Mallamad, Assistant Prosecuting Attorney, for appellants.

Mazanec, Raskin, Ryder & Keller Co., L.P.A., John T. McLandrich, and Frank H. Scialdone, Cleveland, urging reversal for amici curiae County Commissioners Association of Ohio and County Risk Sharing Authority.