[Cite as *Fediaczko v. Mahoning Cty. Children Servs.*, 2012-Ohio-6090.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| W. GORDON FEDIACZKO, ADM. OF THE ESTATE OF J.H., | ) ) ) | CASE NO.   11 MA 186 |
| PLAINTIFF-APPELLEE, | ) ) | |
| VS. | ) ) | O P I N I O N |
| MAHONING COUNTY CHILDREN SERVICES, et al., | ) ) ) | |
| DEFENDANTS-APPELLANTS. | ) | |

| | |
|---|---|
| CHARACTER OF PROCEEDINGS: | Civil Appeal from Common Pleas Court, Case No. 09CV1929. |
| JUDGMENT: | Reversed in part; Dismissed in part. |

APPEARANCES:

| | |
|---|---|
| For Plaintiff-Appellee: | Attorney Shirley Smith 1399 East Western Reserve Rd., Suite 2 Poland, Ohio  44514 |
| For Defendants-Appellants: | Attorney Daniel Downey Attorney J. Quinn Dorgan 10 West Broad Street, Suite 2400 Columbus, Ohio  43215 |

JUDGES:
Hon. Joseph J. Vukovich
Hon. Gene Donofrio
Hon. Mary DeGenaro

Dated:  December 20, 2012

VUKOVICH, J.

{¶1} Defendants-appellants Denise Stewart, Erin Davis, and Kim Vechiarelli appeal the decision of the Mahoning County Common Pleas Court denying their motion for summary judgment in which they argued in main part that, as employees of a political subdivision, they were immune from liability for the death of a fifteen-year-old.

{¶2} Denise Stewart alleges that the estate improperly attempts to impose respondeat-superior liability upon her for merely being the Executive Director of Mahoning County Children Services without any evidence of direct involvement or recklessness on her part. We agree that she is immune from liability as an employee of a political subdivision as her own acts were not shown to be reckless. The trial court's decision denying summary judgment to Ms. Stewart is reversed, and summary judgment is entered in her favor.

{¶3} Caseworker Erin Davis alleges that a reasonable trier of fact could not find that she acted with the requisite level of culpability in investigating the child's residence or in recommending placement of the child. Although a case for negligence could be established, we conclude that there is no summary judgment evidence showing that Ms. Davis acted maliciously, in bad faith, wantonly, or recklessly. Thus, Ms. Davis is immune from liability, the trial court's decision is reversed, and summary judgment is entered in favor of Ms. Davis.

{¶4} Caseworker Kim Vechiarelli argues that her actions and omissions could not have harmed the child because the child's former custodian believed that the child was already dead by the time Ms. Vechiarelli was assigned as a caseworker. She also states that injury to another person for acts occurring after the child's death cannot be shown because the only named plaintiff was the administrator of the estate. However, these arguments are unrelated to immunity. Consequently, Ms. Vechiarelli's appeal is dismissed as the denial of summary judgment on these contentions is not a final appealable order.

## STATEMENT OF THE CASE

{¶5} The deceased child [hereinafter J.H.] was born in Japan in December of 1985. His parents divorced in 1991, and he stayed with his mother in Japan for much of his childhood. In the summer of 1999, when the child was thirteen, his eleven-year-old brother visited Japan. During this time, the younger brother was said to have committed suicide by hanging himself.

{¶6} In November of 1999, the mother could no longer handle J.H.'s behavioral problems, and she sent him to his father in Youngstown. Before long, the father refused custody of the child, citing multiple behavioral problems such as defiance, homicidal threats, and marijuana smoking. The father also voiced his suspicions that J.H. was involved in the younger child's hanging. J.H. began living with a family friend.

{¶7} In March of 2000, the juvenile court adjudicated J.H as an unruly child, placed the child on probation, and ordered him to attend counseling. The court provided temporary custody to a family friend, noting that she was willing to keep him only until the school year ended. The temporary custodian relinquished custody in the summer of 2000, at which time the father refused to assume custody.

{¶8} At that time, J.H. began living with Jennifer Snyder, who was related to one of the father's ex-wives, and David Sharpe, who was Jennifer Snyder's boyfriend. In August of 2000, they contacted the agency to accuse the father of abusing J.H. and to receive financial assistance.

{¶9} Caseworker Erin Davis was assigned to investigate the allegations against the father and determine the propriety of J.H.'s living arrangement. This caseworker conducted a home study, which she found positive, and contacted personal references, which were also positive. Both Jennifer Snyder and David Sharpe reported that they were college students on the Dean's list.

{¶10} The caseworker ran criminal background checks. Jennifer Snyder had a 1994 wrongful entrustment conviction and 1999 arrests for telephone harassment and criminal damaging from which she pled to telephone harassment and was placed on probation. David Sharpe had 1991 domestic violence and criminal damaging charges for which he was sent to a mental hospital for evaluation; these charges

apparently did not result in convictions. In 1993, he was arrested on four counts of forgery, four counts of theft, and receiving stolen property. He pled to four counts of forgery, was incarcerated for four months, and gained release from prison on shock probation in October of 1993.

{¶11} Upon the agency's motion to transfer custody, the juvenile court scheduled a custody hearing. As Caseworker Davis was to be on vacation the day of the hearing, the agency's attorney had her sign an affidavit wherein she recommended Jennifer Snyder as custodian. She also provided the details of her work to the agency's attorney. In October of 2000, a juvenile court magistrate found the child dependent and granted legal custody to Jennifer Snyder and David Sharpe. The agency closed the case at this time.

{¶12} In December of 2000, an anonymous caller reported to the agency that David Sharpe used drugs and that J.H. had been frightened when a drug dealer came to the house demanding money. An agency worker interviewed David Sharpe and the child, but found no evidence of abuse or neglect.

{¶13} On June 14, 2001, the agency was informed by a caller that David Sharpe had been arrested two days before for abusing Jennifer Snyder and J.H. The affidavit of Executive Director Denise Stewart states that (unnamed) agency personnel contacted the responding police officers and learned that the offense did not involve the child.

{¶14} Upon hearing about David Sharpe's arrest, the former temporary custodian called the agency on June 18, 2001 to report her concern that J.H. was being abused by David Sharpe. She also stated that he had been locking J.H. in the basement and that the mother had been unable to contact the child. According to the affidavit of Executive Director Stewart, Caseworker Kim Vechiarelli was assigned to the case on June 18, 2001. On August 6, 2001, this caseworker closed the case. She reported that she conducted a face-to-face interview with the child and the custodians and claimed that the child said he was happy and well-treated.

{¶15} Some months later, J.H. was reported as a run-away or otherwise missing. It was not discovered until 2007 that Ms. Vechiarelli's report was false as

she had never interviewed the child. This discovery arose when Jennifer Snyder, while jailed in 2007, informed authorities that David Sharpe had killed J.H. and that she had helped him dispose of the body. She estimated that this took place on June 15 or 16 of 2001.

**{¶16}** Both custodians were indicted for various offenses. Thereafter, Jennifer Snyder pled guilty to endangering a child (lowered from permitting abuse of a child) and gross abuse of a corpse. David Sharpe pled to reckless homicide (lowered from murder), gross abuse of a corpse, and attempted tampering with evidence.

**{¶17}** According to the affidavit of the investigating detective, when Caseworker Vechiarelli was first interviewed in 2007, she reported that she had interviewed J.H. on or about August 6, 2001. Six weeks later, she admitted that her prior statement to police and her statements in the case file were false as she never made those contacts. She also disclosed that she shredded her notes when she changed positions within the agency.

**{¶18}** The child's estate filed an action against the Mahoning County Children Services agency, its board, a supervisor no longer at issue, Executive Director Denise Stewart, Caseworker Erin Davis, Caseworker Kim Vechiarelli, Jennifer Snyder, and David Sharpe. The complaint alleged vicarious liability, improper screening, placement, and monitoring, falsification of reports, negligence per se, negligent hiring and supervision, misrepresentation or detrimental reliance, and wrongful death.

**{¶19}** The agency, board, and its employees moved for summary judgment asserting statutory immunity among other things. On November 2, 2011, the trial court granted summary judgment in favor of the agency and the board on the grounds of immunity, which was appealed by the estate in 7th Dist. No. 12MA199. The trial court granted summary judgment for the aforementioned supervisor on grounds that no liability was established. Relevant to this appeal, the trial court denied the request for summary judgment filed by Executive Director Stewart and the

two caseworkers, the three of whom filed this appeal. The denial of immunity is appealable under R.C. 2744.02(C).

POLITICAL SUBDIVISION EMPLOYEE IMMUNITY

**{¶20}** In an action against an employee of a political subdivision to recover damages for injury, death, or loss to person or property allegedly caused by an act or omission in connection with a government or proprietary function, the employee is immune unless: (a) the acts or omissions were manifestly outside the scope of the employee's employment; (b) the acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or (c) civil liability is expressly imposed by a statute. R.C. 2744.03(A)(6)(a)-(c).

**{¶21}** Subsection (b) is the only section alleged to be pertinent here as the estate argues that each employee's behavior was wanton and reckless. As the estate points out, recklessness in this context is a perverse disregard of a known risk. *O'Toole v. Denihan*, 118 Ohio St.3d 374, 889 N.E.2d 505, 2008-Ohio-2574, ¶ 73. It necessarily requires something more than mere negligence as the actor must be conscious that his conduct will in all probability result in injury. *Id.* at ¶ 74.

**{¶22}** "Although the determination of recklessness is typically within the province of the jury, the standard for showing recklessness is high, so summary judgment can be appropriate in those instances where the individual's conduct does not demonstrate a disposition to perversity." *Id.* at ¶ 75 (upholding summary judgment and granting immunity to agency employees in a case where a child died from abuse). The Supreme Court has warned that a determination of recklessness regarding children services employees is to be conducted without using 20-20 hindsight and without emotional consideration. *Id.* at ¶ 76.

**{¶23}** Summary judgment can be granted where there remain no genuine issues of material fact for trial and where, after construing the evidence most strongly in favor of the nonmovant, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. *Byrd v. Smith*, 110 Ohio St.3d 24, 2006–Ohio-3455, 850 N.E.2d 47, ¶ 10, citing Civ.R. 56(C). The burden of showing that there is no genuine issue of material fact initially falls upon the party who files for

summary judgment. *Id.*, citing *Dresher v. Burt*, 75 Ohio St.3d 280, 294, 662 N.E.2d 264 (1996).

**{¶24}** Thereafter, the nonmovant may not rest upon mere allegations or denials in the party's pleadings but must respond by setting forth specific facts showing that there is a genuine issue for trial. *Id.*, citing Civ.R. 56(E). "If the party does not so respond, summary judgment, if appropriate, shall be entered against the party." Civ.R. 56(E). Although courts are cautioned to construe the evidence in favor of the nonmoving party, summary judgment is not to be discouraged where a nonmovant fails to respond with evidence supporting the essentials of his claim. *Leibreich v. A.J. Refrigeration, Inc.*, 67 Ohio St.3d 266, 269, 617 N.E.2d 1068 (1993).

**{¶25}** The trial court found genuine issues of material fact as to whether the three individual appellants acted with recklessness in the performance of their duties. The appellants' brief sets forth four assignments of error, one for each appellant, and one complaining about the estate's submission of expert opinions as to whether the acts or omissions were reckless. We address this last assignment of error first as it deals with whether we should consider certain evidence in considering the question of immunity.

## EXPERT OPINIONS

**{¶26}** "THE OPINIONS OF [THE ESTATE'S] SO-CALLED EXPERTS ARE INAPPOSITE TO THE ISSUE OF WHETHER STEWART, DAVIS OR VECHIARELLI HAVE IMMUNITY."

**{¶27}** In the summary judgment stage, the estate submitted the affidavits of the detective who investigated J.H.'s death in 2007 and a physician who reviewed the case for the estate in preparation for trial. The detective first set forth factual matters from his investigation, including the fact that Kim Vechiarelli's notes falsely reported that she had met with J.H. in August of 2001. The detective's affidavit also contained his opinion that the acts and omissions of the board and its worker were "of a perverse nature and in my opinion placed the child [J.H.] at a willful, wanton and unreasonable risk of harm."

{¶28} The physician's affidavit first set forth various facts he learned from a review of the case file. His affidavit also contained his opinion (to a reasonable degree of medical certainty) that the actions and inactions of the agency and its employees were "willful, wanton, reckless, malicious and in bad faith, and further unreasonable in that they placed the child at substantial risk of known harm, further demonstrating a perverse disregard for the child/risk * * *."

{¶29} Appellants begin by acknowledging that it is unknown whether the trial court considered these opinions when it determined that there remained a genuine issue of material fact as to recklessness. As we conduct a de novo review, appellants then argue that this court should not rely on these opinions to establish recklessness because the determination of this mental culpability is a legal conclusion, which is not a matter for an expert. Appellants also argue that neither affiant was qualified to testify as an expert on that legal issue.

{¶30} Civ.R. 56(E) states that affidavits "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." It has been stated that an expert affidavit opining that agency acts or omissions were reckless under R.C. 2744.03(A)(b) is an improper legal conclusion that should not be included in an affidavit used to show a genuine issue of material fact. *Lindsey v. Summit Cty. Children's Serv. Bd.*, 9th Dist. No. 24352, 2009-Ohio-2457, ¶ 24 (holding that affidavit of forensic examiner and professor of nursing stating that conduct of children service's employees was reckless did not create issue of fact), citing *Hackathorn v. Preisse*, 104 Ohio App.3d 768, 772, 663 N.E.2d 384 (9th Dist.1995) (opinion of engineer and architect that defendant acted recklessly did not create genuine issue because level of mental culpability for determining immunity was the legal issue). Still, an opinion is not inadmissible merely because it embraces an ultimate issue. Evid.R. 704.

{¶31} In any event, just because a plaintiff can find an expert to state in an affidavit that an act was reckless does not mean that there is a genuine issue for trial as to whether the defendant lost her immunity due to recklessness. *Lindsey*, 9th

Dist. No. 24352 at ¶ 24; *Hackathorn,* 104 Ohio App.3d at 772*. See also Pope v. Trotwood-Madison City Sch. Dist. Bd. of Edn.*, 2d Dist. No. 20072, 2004-Ohio-1314, ¶ 17-18.

**{¶32}** In fact, the detective acknowledged at deposition that he does not know if he is qualified to render the opinion in his affidavit and that he is not familiar with the standards at issue. (Milstead Depo. at 7-8). In fact, his statements were mostly used to establish the facts of his investigation.

**{¶33}** We also note that his affidavit discussed three workers but then only opined that one worker was reckless without specifying to whom he was referring. He later testified at deposition that he focused on Kim Vechiarelli. *Id.* at 13. Moreover, his affidavit did not set forth the alleged standard of care regarding the other employees. See, e.g., *Frederick v. Vinton Cty. Bd. of Edn.*, 4th Dist. No. 03CA579, 2004-Ohio-550, ¶ 28-29; *Pope*, 2d Dist. No. 20072 at ¶ 17-18. Thus, Executive Director Stewart and Caseworker Davis have no real complaint regarding the detective's opinion.

**{¶34}** As for Ms. Vechiarelli, the opinion of a detective or a physician would not bolster the child's estate case here. Her failure to ascertain the child's safety when assigned to do so and her false reporting can be found to constitute a perverse disregard by any common layperson. It is unlikely that the trial court found her reckless because of the opinions of the detective and the physician. She does not even contest, in the assignment of error relevant to her motion for summary judgment, that there was a genuine issue for trial regarding her culpability.

**{¶35}** Regarding the complaints of Executive Director Stewart and Caseworker Davis about the physician's opinion, we note that the physician indicated at deposition that he was not familiar with the pertinent law and acknowledged that he was providing an opinion of the system as a whole, not on any individual, noting that bad outcomes are rarely the function of one bad act on one bad day but are the function of a system of care. (Compton Depo. at 6, 53-54). When asked to try to focus on individual acts, he never referred to specific acts or omissions of Executive Director Stewart. As to Caseworker Davis, he did state that her recommendation of

placement was a perverse disregard of this child. *Id.* at 61. However, he believed it was a law that children with mental problems cannot be placed with untrained caregivers, but as shown below, this law refers only to foster home placement, not custody granted by a juvenile court.

**{¶36}** In conclusion, we agree that a genuine issue of material fact as to each individual employee would not have been created merely as a result of the opinion of the detective and the physician that the agency and its employees acted recklessly. Our review of the mental culpability concerning the employees' acts and omissions shall thus proceed based upon our independent review of the specific summary judgment facts relevant to the conduct of each employee.

EXECUTIVE DIRECTOR DENISE STEWART

**{¶37}** "THE TRIAL COURT ERRONEOUSLY DENIED SUMMARY JUDGMENT IN FAVOR OF EXECUTIVE DIRECTOR DENISE STEWART."

**{¶38}** Executive Director Stewart's first argument refers to the estate's claim that she was reckless because she may have violated Ohio Administrative Code 5101:2-5-09.1. The estate argued below that the personnel records received in discovery did not show that a criminal background check had been conducted on Caseworkers Davis or Vechiarelli prior to their employment as required by the cited Administrative Code section. The estate then defined negligence per se as the violation of a legislative enactment which commands or prohibits a specific act for the safety of others and argued that Ms. Stewart's violation of "the statute" constituted negligence per se.

**{¶39}** As Ms. Stewart points out, the violation of an administrative rule does not constitute negligence per se as the doctrine deals with violations of statutes. *Chambers v. St. Mary's School*, 82 Ohio St.3d 563, 568, 697 N.E.2d 198 (1998). The estate does not dispute this on appeal. In fact, after its original response to the motion for summary judgment, the estate later modified its argument to state that although violations of an administrative code may not per se impose liability, the problems giving rise to the violations can help establish liability.

**{¶40}** This is similar to the Supreme Court stating that although the violation of an administrative rule is not negligence per se, it may be admissible as evidence of negligence. *Id.* However, evidence of recklessness is required here. *See O'Toole*, 118 Ohio St.3d 374 at ¶ 92. Without evidence of knowledge that a violation will in all probability result in injury, evidence that policies have been violated demonstrates negligence at best. *Id.*

**{¶41}** Here, no summary judgment evidence was produced to support the factual contention that background checks were not conducted on the two caseworkers prior to their employment. The personnel records are not before this court; nor were they before the trial court. The estate did not produce any affidavit below stating that the two personnel files contained no evidence of background checks.

**{¶42}** In any event, the absence of a criminal record print-out in a personnel file does not establish that no criminal record check was performed. Notably, the code section requires the appointing or hiring officer or administrative director of the agency to provide a record check form and fingerprint card to the prospective employee for completion *and to then forward the form and fingerprints to the BCI* who is to perform the actual check. Ohio Adm. Code 5101:2-5-09.1(B), (I). The applicant is not considered for hiring unless the check is satisfactorily completed. Ohio Adm. Code 5101:2-5-09.1(B)(2). There is no requirement that evidence of the check be kept in the employee's personnel file if they eventually do get hired.

**{¶43}** As Executive Director Stewart points out, the estate could have deposed her or others to ascertain whether a criminal background check had been performed on Davis and Vechiarelli prior to their employment. Additionally, as Ms. Stewart notes, even if the estate put forth evidence that criminal background checks had not been performed prior to the hiring of these caseworkers, the estate did not even contend (let alone provide evidence) that there was something negative in the criminal backgrounds of either of these two employees.

**{¶44}** In the alternative, there is no clear evidence that Ms. Stewart was the Executive Director when these caseworkers were being considered for employment.

Ms. Stewart's affidavit states that she held the Executive Director position throughout the years of 2000 and 2001. There is no evidence regarding when Caseworker Vechiarelli was first considered for employment.

**{¶45}** As for Caseworker Davis, her affidavit states: "In 2000, I was employed by Mahoning County Children's Services as a caseworker. * * * In August of 2000, I was assigned [to this] case * * *." This does not establish that Ms. Davis was first considered for hiring by the agency in 2000.

**{¶46}** As Executive Director Stewart states, the estate did not effectively utilize discovery in order to support its supposition regarding whose duty it was to ensure background checks were conducted on these two caseworkers, whether background checks were conducted prior to considering the caseworkers for hiring, and if not, whether there was any criminal background that would have been discovered had checks been conducted on these two caseworkers.

**{¶47}** The estate's next argument pertaining to Executive Director Stewart revolves around the acts or omissions of other employees, including the agency's failure to fully investigate prior to recommending placement and the failure to fully investigate allegations as they arose. The estate complains that this all occurred under Ms. Stewart's direction of the agency and that it was her responsibility to prevent this from happening. Ms. Stewart counters that, by making these arguments, the estate is improperly attempting to impose liability on her under a respondeat-superior theory. She concludes that the estate must demonstrate her own personal acts or omissions that were wanton, reckless, in bad faith, or malicious.

**{¶48}** As Executive Director Stewart points out, common law agency principles are trumped by the immunity statute. *Friga v. East Cleveland*, 8th Dist. No. 88262, 2007-Ohio-1716, ¶ 28 (holding that trial court did not err by granting the mayor summary judgment as she was immune from suit for actions undertaken by a city employee she supervised). The statute specifically states that the employee is immune unless *the employee's* acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner. R.C. 2744.03(A)(6)(b).

**{¶49}** The estate initially replies that it is not trying to impose respondeat-superior liability. Yet, the estate then generally urges that Executive Director Stewart should be liable because it was her responsibility to prevent this from happening. Thus, the estate's general argument does attempt to impose liability by relying on Ms. Stewart's mere position and the acts of others (without any allegation that she knew or should have known of those acts at a pertinent time).

**{¶50}** There is no indication that Executive Director Stewart was reckless merely because of the acts or omissions of certain agency employees. She provided an affidavit stating that she did not directly supervise the caseworkers and that she was not involved in this case. The estate did not provide summary judgment evidence that Executive Director Stewart was reckless in the duties that she is required to perform. Instead, the estate relies upon its conclusion that Caseworker Davis gave a faulty recommendation to the juvenile court, that unnamed workers should have investigated more after two anonymous telephone calls, and that Caseworker Vechiarelli provided false information in the case file. However, recklessness by the Executive Director cannot be inferred from these acts or omissions of the various caseworkers who were involved in this case.

**{¶51}** By asserting liability for the acts or omissions of caseworkers, the estate is essentially attempting to impose liability upon Ms. Stewart by mere virtue of the fact that she was the Executive Director of the agency during the time of the agency's contact with the child. Respondeat-superior liability is not an exception to immunity. See R.C. 2744.03(A)(6)(b); *Friga*, 8th Dist. No. 88262 at ¶ 28 And, employees are immune from mere negligent acts or omissions performed in the scope of their employment. R.C. 2744.03(A)(6).

**{¶52}** In preparing for the summary judgment stage of the proceedings, the estate did not fully utilize the discovery process by investigating Executive Director Stewart's activities and knowledge, and we cannot infer recklessness by the mere fact that she was the Executive Director. Just as the statute essentially provides that the county is not liable merely because it runs an agency during a time when its employees failed to protect a minor, the statute essentially provides that its Executive

Director is not liable merely because she holds that position during that same time. Even if others were reckless, we cannot impute that mental state to the Executive Director without evidence of her own acts of recklessness.

**{¶53}** The estate also suggests that Executive Director Stewart destroyed evidence. However, there is no evidence to support this allegation. It was established that Ms. Vechiarelli shredded her notes when she changed positions within the agency, but it was never shown or alleged that Ms. Stewart participated in this act. The only evidence presented regarding Ms. Stewart's involvement in the file was deposition testimony that she was not immediately cooperative in providing the file to the police in 2007. (Milstead Depo. 9). Even then, the detective believed that Ms. Stewart was acting on legal advice and acknowledged that a municipal court judge told him there was "no way" he was getting the file by merely asking the agency for it. *Id.* at 11.

**{¶54}** The estate's other argument directly related to Ms. Stewart in the trial motions was an allegation that Ms. Stewart received the June 18, 2001 call from J.H.'s former custodian, citing paragraph 15 of her affidavit. However, paragraph 15 of Ms. Stewart's affidavit does not state that she received the call; it states that the agency received the call and Caseworker Vechiarelli was assigned that day. Ms. Stewart's second affidavit stated that she did not participate in agency activities regarding the child in 2000 or 2001 and did not participate in the court proceedings involving the grant of custody to Jennifer Snyder and David Sharpe. She reported that her only knowledge of this child was from her recent review of the file.

**{¶55}** The estate also cited the June 18, 2001 Intake Form prepared by Caseworker Vechiarelli. The chronology of contacts attached to this form states: "6/18/01 (Gretchen Bowman): Denise Stewart received a phone call from former legal guardian * * * " and then relates the conversation with the former custodian.

**{¶56}** This is part of the agency's case file that was provided to the trial court during discovery. The estate did not depose Ms. Bowman, Caseworker Vechiarelli, Executive Director Stewart, or any other individual to ascertain the accuracy of the intake form or present answers to interrogatories or otherwise turn this evidence into

the type of evidence available for use at summary judgment. The detective's affidavit purported to incorporate the agency's case file and Ms. Stewart's affidavit was constructed based upon her review of the file. Both parties agree that the agency case file possessed by the trial court was part of the summary judgment evidence upon which the court was permitted to rely. See Defendant's July 15, 2011 Motion for Summary Judgment at 1; Plaintiff's August 15, 2011 Response to Summary Judgment at 14.

**{¶57}** Even viewing the intake form and assuming that Executive Director Stewart took the June 18, 2001 telephone call, an exception to immunity is not apparent. There is no suggestion as to how the Executive Director acted recklessly after receiving that telephone call. The case was assigned to a caseworker on that very date, and it was that caseworker who later closed the case after falsely reporting that she had met with the child and his caregivers.

**{¶58}** Ms. Stewart explained in an affidavit that as Executive Director she oversees operations, policies, and staff at an agency-wide level. She noted that she does not function as a caseworker nor is she a caseworker supervisor, specifying that she did not directly supervise Erin Davis or any other caseworker assigned to this case. She said that it is the responsibility of the caseworkers to interact with the children and their caregivers.

**{¶59}** Due to the minimal discovery conducted, there was nothing presented to show what act of Ms. Stewart regarding the June 18, 2001 telephone call constituted recklessness. In *O'Toole*, the Supreme Court ruled in favor of an intake supervisor who was very involved in the caseworker's investigation and who admitted supervisory error in allowing the child to remain with the person who ended up killing her. *O'Toole*, 118 Ohio St.3d 374. Still, the Court held that there was no genuine issue of material fact as to recklessness and that any mistakes or violations of administrative code sections or violations of agency policies did not rise to the level of recklessness. *Id.* Ms. Stewart's involvement by (allegedly) receiving the final telephone call and assigning a caseworker that day does not rise to the level of recklessness.

**{¶60}** In conclusion, Executive Director Stewart should have been granted immunity because there was no showing through actual summary judgment evidence that there was a genuine issue of material fact as whether she, herself, acted maliciously, in bad faith, wantonly, or recklessly. The estate provided no evidence that Ms. Stewart herself consciously left the child in a situation with the knowledge that further injury was a substantial certainty or consciously permitted the caseworkers to conduct inadequate investigations. *See O'Toole*, 118 Ohio St.3d 374 at ¶ 78. The trial court's decision denying immunity to Executive Director Stewart is reversed, and judgment is entered in her favor.

CASEWORKER ERIN DAVIS

**{¶61}** ""THE TRIAL COURT ERRONEOUSLY DENIED SUMMARY JUDGMENT IN FAVOR OF CASEWORKER ERIN DAVIS."

**{¶62}** In seeking summary judgment, Caseworker Davis urged that there was no evidence that she acted maliciously, in bad faith or in a wanton or reckless manner. She relied upon her affidavit and the attachments from the file that she certified were true and accurate. Her affidavit states that she was first assigned to the case in August of 2000. She attached to her affidavit a list of Chronological Contacts, which she created in October of 2000 to record her activities, and the juvenile court's eventual custody order. She also attached the Home Study, which recorded the information she obtained about Jennifer Snyder and David Sharpe.

**{¶63}** Her affidavit stated that based upon the information she collected and personally observed, she believed that they were ready, willing, and able to provide a good home and family for this fifteen-year-old. She noted that she was not present at the custody hearing. Her affidavit, which was submitted to the juvenile court in lieu of testimony, recommended only that *Jennifer Snyder* be awarded legal custody. She provided all of the information she collected to the agency's attorney before the hearing for presentation to the court. Caseworker Davis stated that her involvement with this matter ended after the juvenile court awarded custody of the child to both Jennifer Snyder and David Sharpe and that she was never thereafter assigned to conduct further activities regarding the child, Jennifer Snyder, or David Sharpe.

**{¶64}** Before delving into the estate's main claim that Caseworker Davis' recommendation and initial investigation were lacking, we address some other arguments set forth by the estate regarding claimed instances of recklessness after custody was granted by the court. For instance, the estate points to the anonymous call to the agency two months after the juvenile court granted custody, wherein the caller voiced that David Sharpe used drugs and that a drug dealer came to the house. However, the caseworker assigned to investigate was not Ms. Davis.

**{¶65}** The estate then pointed to the June 14, 2001 call to the agency reporting that David Sharpe had been arrested for domestic violence on June 12, 2001. However, the caseworker who called the Youngstown Police to inquire was not Ms. Davis. Nor was Ms. Davis involved at the time of the June 18, 2001 call to the agency from the prior custodian to report her concern about the child being abused. Likewise, Caseworker Davis had nothing to do with Caseworker Vechiarelli's inadequate investigation or false reporting of interviews in the summer of 2001.

**{¶66}** The estate also cited Ohio Administrative Code 5101:2-5-34, urging that a six-month review was required and that such a review would have spotlighted the issues in the household. Yet, this rule deals with a private child placing agency or a private noncustodial agency. In any event, the estate provided no evidence that such was the duty of Ms. Davis, who stated that her involvement ended after the juvenile court granted custody of the child and who was not reassigned the case until two months later, upon receipt of the first anonymous call. In fact, her chronological contacts list has an entry made by her supervisor, Ms. Bowman, stating that after the custody hearing, *Ms. Bowman advised* the couple that the case will be closed.

**{¶67}** As aforementioned, the estate's main argument here deals with Caseworker Davis' recommendation that Jennifer Snyder be granted legal custody, claiming there was evidence that she displayed perverse disregard by recommending such placement. The estate's focus is on the criminal history of Jennifer Snyder and David Sharpe that Ms. Davis had obtained and which was within the home study attached to her affidavit. Jennifer Snyder was charged with wrongful entrustment in

1994 and apparently spent a day in jail for that and for parking tickets. In 1999, she was charged with telephone harassment and criminal damaging. The criminal damaging was dismissed, and she was on probation for the telephone harassment at the time of the home study.

{¶68} David Sharpe had 1991 domestic violence and criminal damaging charges for which he was sent to a mental hospital for evaluation; he was then released per court order with no indication of a conviction. In 1993, he was arrested on four counts of forgery, four counts of theft, and receiving stolen property. He went to prison for a few months and was released on shock probation in October of 1993. In 1994, he was arrested for failure to comply with a court order and driving under suspension.

{¶69} The estate urges that the criminal history of Jennifer Snyder and David Sharpe clearly demonstrates that a child with mental problems, who was alleged to have been previously abused by his father, should not have been placed with these individuals. In support, the estate noted below that a domestic violence conviction disqualifies a foster caregiver under Ohio Administrative Code 5101:2-5-09.1 and 5101:2-5-34. On appeal, the estate adds that a domestic violence conviction disqualifies a relative or non-relative from accepting placement from a private child placing agency under Ohio Administrative Code 5101:2-42-18.

{¶70} The estate also pointed out that an agency shall not allow a special needs child to be placed in a foster home unless the foster caregiver has been certified to operate a treatment foster home, citing Ohio Administrative Code 5101:2-5-36(A). The estate argues that even if negligence per se is not derived from administrative rules and if the violation of rules cannot be recklessness per se, the placement in violation of these rules can assist in demonstrating recklessness. This may be true, but the rules cited were not violated.

{¶71} As Ms. Davis responds, Ohio Administrative Code 5101:2-5-09.1 and 5101:2-5-36(A) deal with foster care, and this placement was not foster care but rather was a court custody decision regarding a child that was already staying with people with permission of the child's father, who refused to care for the child. *See*

R.C. 2151.011(B)(19) (delineating the parameters of legal custody); R.C. 2151.011(B)(36) (defining placement in foster care as involving a child of whom the agency has temporary or permanent custody); R.C. 5103.02(C); O.A.C. 5101-2:1-01(B)(92) (a legal ward living in a foster home is not a foster child). The other rules cited by the estate deal with private agencies. *See* O.A.C. 5101:2-42-18(G); O.A.C. 5101:2-5-34.

**{¶72}** Regardless, there was no indication that David Sharpe was *convicted* of domestic violence as only an arrest was apparent on his criminal history. Thus, although the rules may be relevant as a comparison tool, they were not directly pertinent nor were they violated.

**{¶73}** Caseworker Davis points out that the juvenile court was the entity that granted legal custody to both David Sharpe and Jennifer Snyder. Notably, her recommendation only stated that Jennifer Snyder should receive legal custody. She notes that she did not lie or fabricate the home study, but merely formulated an opinion from her meetings and investigation. She urges that the estate's claim regarding her recommendation is based upon hindsight and second-guessing of her opinion, which the juvenile court accepted.

**{¶74}** In denying summary judgment, the trial court found that Ms. Davis could not attempt to shift responsibility for the custody decision to the juvenile court because that decision: "was based largely allegedly on false information provided to it by Defendant Davis though affidavit testimony. A review of the record demonstrates that based on the sworn testimony provided by Davis, the Juvenile Court would have no reasonable basis to suspect that the testimony was not true or to not accept Davis' recommendations regarding [J.H.]'s placement." Judgment Entry (Nov. 2, 2011).

**{¶75}** However, an opinion is just that: an opinion. It is not something that is "false" merely because others disagree with her belief that a person seems suitable as a custodian, especially where neither the child's mother nor the child's father could handle the child's behavior, the child was fifteen, he was at this residence with the permission of the parents, and the child had been doing well at this residence. As

Ms. Davis urges, there is no indication in the record before us that she provided false information to the juvenile court. As she suggests, it is possible the trial court confused her actions with those of Ms. Vechiarelli, whose notes contained false information.

**{¶76}** Caseworker Davis was not at the custody hearing. Her affidavit submitted to the juvenile court in lieu of live testimony was fairly bare and conclusory, *but she provided all of the information she collected to the agency's attorney,* presumably for submission to the juvenile court. What the attorney provided to the juvenile court is unknown, and any possible failure to present all information to the court would not be the omission of Ms. Davis under these circumstances.

**{¶77}** Recklessness is not established by focusing of an affidavit on a final opinion and submitting one's notes and home study to the agency attorney to support that opinion so the juvenile court could make its own conclusion. Ms. Davis was on vacation during the hearing; if the attorney or the court believed her presence was needed to ascertain why she believed people with their criminal histories and lack of training should receive custody, the court or attorney could have continued the hearing for her presence.

**{¶78}** The estate also complains that the home study lists the monthly expenses, but the income reported does not meet those expenses. This is because it lists what David Sharpe received in unemployment benefits but did not list Jennifer Snyder's income at the part-time job where she had been employed for six years. Thus, it does not establish that their expenses were more than their incomes.

**{¶79}** The estate then surmises that Caseworker Davis may not have received drug tests from Jennifer Snyder and David Sharpe. The October 12 note says that Ms. Davis instructed the couple to have their drug tests results submitted to her supervisor by the October 19 hearing (as she would be on vacation). The notes do not later state that the test results were received. They do, however, have a note by the supervisor closing the case.

**{¶80}** The estate complains that Ms. Davis' home study reports that Jennifer Snyder and David Sharpe attended college full-time and were on the dean's list but

does not demonstrate whether Ms. Davis verified this information with the college. Ms. Davis responds that even if she did not obtain verification that the couple was in college, the estate provides no evidence that this information was false.

**{¶81}** We conclude that the three preceding arguments are all just suppositions from what the report does not state. Had discovery been further conducted by answers to interrogatories and/or depositions, these suppositions could have been made into summary judgment evidence. A lack of notation on a topic does not make a genuine issue as to whether that topic was investigated or as to whether negative information existed on that topic.

**{¶82}** Caseworker Davis states that her investigation showed positive features regarding Jennifer Snyder and David Sharpe. They took the child in when his temporary custodian left town and his parents had both refused to take custody. The couple made sure he received his medications and that he attended school and counseling. They had a neat home and seemed to be caring and concerned for the child. They were said to be college students.

**{¶83}** Moreover, David Sharpe had a twelve-year-old daughter and had no prior involvement with the agency. To diminish the importance of the domestic violence arrest, Ms. Davis notes that it was an arrest which did not result in a conviction and it occurred nine years prior to her investigation. She points out that David Sharpe's actual convictions were for non-violent offenses and took place six years prior to her investigation. She also notes that Jennifer Snyder's only notable conviction was telephone harassment. Ms. Davis concludes that a reasonable trier of fact could not find that she acted maliciously, in bad faith or in a wanton or reckless manner.

**{¶84}** The estate counters that there is a genuine issue as to whether her investigation was recklessly lacking and thus her recommendation was reckless. As aforementioned, the main focus is the criminal histories, the allegation that the child was previously abused by his father, the couple's lack of training or supervision by the agency, and the child's mental problems.

**{¶85}** We conclude that Ms. Davis provided a recommendation that in hindsight turned out to be regrettable. See *O'Toole*, 118 Ohio St.3d 374 at ¶ 76 (court must apply standard without regard to 20-20 hindsight looking back after child is killed). The juvenile court is the entity that granted the couple legal custody. Maybe she should have provided more background information to the juvenile court in her affidavit. However, as aforementioned, she did provide her home study with notes and contacts to the agency attorney, whom she could reasonably presume would submit the information to the court. What the attorney ended up presenting to the juvenile court in addition to the affidavit is unknown.

**{¶86}** Ms. Davis had before her no past history of bad behavior by the couple toward this child or other children. They took this child in with the permission of both parents when no one else was willing to do so. In the two months she had the case, she spoke with positive personal references, found the house neat, and heard the child speak favorably about his caregivers. They transported the child to counseling, summer school, and ensured he had his medications. They also accompanied him on a school tour of his new high school. They interviewed favorably on her questionnaire.

**{¶87}** Perverse disregard for a known risk is a level of mental culpability that various courts have found lacking in the summary judgment stage. *O'Toole*, 118 Ohio St.3d 374 (reversing appellate court and entering summary judgment for employee where child abuse was suspected but child was not removed and ended up being killed), citing *Jackson v. Butler Cty. Bd. of Cty. Commrs.* (1991), 76 Ohio App.3d 448, 454, 602 N.E.2d 363 (1991) (not reckless where child removed from mother's home due to abused siblings, agency plans to reunite children with parents, and court reunited child with father on agency recommendation, agency ordered by court to continue supervising, agency did not see child for weeks, and father killed her child); *Lindsey v. Summit Cty. Children Servs. Bd.*, 9th Dist. No. 24352, 2009-Ohio-2457 (child struck by someone, agency concluded it was mother without investigating boyfriend because mother would not provide his name, and child later killed by boyfriend); *Grimm v. Summit Cty. Children Servs. Bd.*, 9th Dist. No. 22702,

2006-Ohio-2411 (not reckless where child delivered a baby conceived through sexual abuse but hospital let child leave with mother and step-father, who later killed her).

{¶88} Recklessness in this context is not a low standard as the actor must be conscious that his conduct will in all probability result in injury. *O'Toole*, 118 Ohio St.3d 374 at ¶ 3. *Compare C.S. Hahn v. Wayne Cty. Children's. Servs. Bd.*, 9th Dist. No. 00CA0029 (May 9, 2001) (recklessness where agency employees "knowingly placed a foster child with a history of sexually abusing younger children with first-time foster parents who had young children, without warning the family about the foster child's deviant sexual behavior.").

{¶89} Although there may have been an agency-wide failure with multiple instances of missed opportunities by multiple individuals, the acts or omissions of just Caseworker Davis did not "demonstrate a disposition to perversity." *See O'Toole*, 118 Ohio St.3d 374 at ¶ 75. The estate did not create a genuine issue of material fact as to whether Ms. Davis was conscious that her acts or omissions would in all probability result in injury to the child. Therefore, this assignment of error is sustained. The trial court's judgment denying immunity to Caseworker Davis is reversed, and judgment is entered in her favor.

CASEWORKER KIM VECHIARELLI

{¶90} "THE TRIAL COURT ERRONEOUSLY DENIED SUMMARY JUDGMENT IN FAVOR OF CASEWORKER KIM VECHIARELLI."

{¶91} According to the agency file and the affidavit of Executive Director Stewart, Caseworker Vechiarelli was assigned to the case on June 18, 2001. This was the day the temporary custodian called the agency to express concern that the child was being abused, that she learned David Sharpe had been arrested a few days prior, and that the child is often locked in the basement. Ms. Vechiarelli attempted to contact the residence and eventually discovered that they had moved a few months before.

{¶92} Caseworker Vechiarelli reported that Jennifer Snyder told her that the child's bedroom was in the basement and that they do not lock him in. She also reported that Jennifer Snyder told her that she only called the police on David Sharpe

because she was mad at him for cheating on her. An appointment was made for a home visit but no one was home when the worker arrived. The worker claimed that she attempted telephone calls and home visits thereafter and finally succeeded in a home visit on August 6, 2001.

{¶93} Caseworker Vechiarelli falsely reported that she had a face-to-face interview with Jennifer Snyder, David Sharpe, and the child. She even described the home as neat, clean, and well-furnished with functioning utilities and plenty of food. She claimed that J.H. told her that his custodians "take really good care of him," that they do not mistreat him, that he was happy there, and that he was afraid of his father. She then reported that she advised J.H. that if there were future problems, he should talk to his counselor. She closed the case that day.

{¶94} As aforementioned, Jennifer Snyder reported in 2007 that David Sharpe killed the child in 2001. She estimated that the death occurred on June 15 or 16, 2001. A detective was assigned to the case, and he interviewed Ms. Vechiarelli. Ms. Vechiarelli verified that she had face-to-face contact with the child on August 6, 2001, as she reported in the agency file. The detective's affidavit submitted by the estate in support of summary judgment states that when he interviewed her a second time and informed her that the child had been killed on June 15 or 16, she indicated that her statements and reports in the file were false. When the detective showed Ms. Vechiarelli photographs of the child, Jennifer Snyder, and David Sharpe, she admitted that she had never seen any of those individuals. (Milstead Depo. at 19). She also stated that she had shredded her notes when she changed positions within the agency. The detective opined that the inaccuracies caused substantial delay and created an impediment to the investigation.

{¶95} In the trial motions, Ms. Vechiarelli noted that it was undisputed that the child died on June 15 or 16, 2001. The evidence in the file and reiterated in the Executive Director's affidavit generated from her review of the file was that Ms. Vechiarelli was not assigned to the case until June 18, 2001. Ms. Vechiarelli then briefly argued below that her involvement took place after the death and thus could not have caused J.H. to suffer an injury. The estate briefly responded that it was

irrelevant that Ms. Vechiarelli did not become involved until after J.H.'s death because wrongful death was not the sole claim. The estate then focused on the recklessness of Ms. Vechiarelli's acts and omission.

{¶96} The issue raised on appeal by Ms. Vechiarelli does not involve the question of her recklessness. She does not attempt to argue that she was not reckless and thus apparently concedes that there is a genuine issue of material fact as to whether she was reckless in falsely reporting a face-to-face interview with this child and his custodians and then in closing the case.

{¶97} On appeal, Ms. Vechiarelli urges that her conduct did not cause injury or death to the child, stating that the child was already dead when she was assigned the case. She focuses on the fact that the only plaintiff named in the complaint is the administrator of the estate. She emphasizes that the personal representative of an estate can bring a survival action for *the decedent's own injuries leading to his death* and a wrongful death action for the injuries suffered by the decedent's beneficiaries *as a result of the death. See Peters v. Columbus Steel Castings Co.*, 115 Ohio St.3d 134, 2007-Ohio-4787, 873 N.E. 2d 1258, ¶ 11 (decedent's beneficiaries not bound by decedent's arbitration agreement).

{¶98} Ms. Vechiarelli concludes that the estate did not claim (and would have no standing to claim) that certain people suffered harm as a result of what she did or did not do after the death, suggesting that those people would have to file individual claims against her rather than make these claims through the estate, which can only represent them in a wrongful death action and which action only deals with acts prior to death. She argues that a wrongful death action filed by a personal representative on behalf of next of kin cannot include a request for damages based upon the behavior of one person after the death of the decedent (caused by another) as those actions are independent of the death.

{¶99} The statute which creates the wrongful death cause of action and provides the personal representative with authority to act speaks of damages suffered "by reason of the wrongful death." R.C. 2125.01(A)(1). And, it has been stated that a personal representative does not have standing to assert every claim

that statutory beneficiaries possess. *See Bentley v. Grange Mut. Cas. Ins. Co.*, 119 Ohio App.3d 93, 102-103, 594 N.E.2d 529 (10th Dist.1997) (administrator, who can enforce wrongful death rights of statutory beneficiaries, has no standing to enforce the uninsured motorist rights of decedent's next of kin which arise from contract), citing *Cincinnati Ins. Co. v. Jarvis*, 98 Ohio App.3d 155, 163, 648 N.E.2d 30 (6th.Dist.1994) and *Smith v. Erie Ins. Group*, 61 Ohio App.3d 794, 797, 573 N.E.2d 1174 (5th Dist.1990).

{¶100} The estate cites no statute or law providing a personal representative with authority to act on behalf of next of kin for acts or omissions (such as an inadequate investigation into a decedent's status) that occurred after the decedent's death (a death not caused by the defendant at issue). *Compare* R.C. 2125.01(A)(1); R.C. 1713.39 (granting personal representative authority to sue a person or entity having unlawful possession of a dead body for the benefit of the decedent's next of kin). However, contrary to Ms. Vechiarelli's assumptions, the estimated date of death, provided by the former custodian (who helped destroy a child's body) more than six years after the death, is a factual rather than an established matter, especially where two days make all the difference to Ms. Vechiarelli's argument here.[1]

{¶101} However, these claims of lack of standing, date of death, and failure to state a claim are not immunity issues. Only the denial of immunity is immediately appealable by the employee of a political subdivision. *See* R.C. 2744.02(C). *See also Hubbell v. Xenia*, 115 Ohio St.3d 77, 2007–Ohio–4839, 873 N.E.2d 878, ¶ 9 (denial of summary judgment is generally not appealable).

{¶102} Although the employee appealed from the order that denied immunity and she couches her argument as being a reason why immunity should be maintained, she *does not actually make immunity arguments*. Rather, her arguments

---

[1]The estate also notes that, since her record of falsification is established, there is no reason to believe that she was assigned on June 18 as this date was derived from her own notes and a troubling call was also received on June 14.

involve standing, the contents of the complaint, and the date of death. Even if there was no such doctrine as immunity, she would be making these same arguments.

{¶103} Moreover, the immunity statute speaks in terms of damages "allegedly caused" by Ms. Vechiarelli's acts or omissions. *See* R.C. 2744.03(A). Immunity is a defense that exists even if there is duty, breach, proximate cause, and damages. *See McCleary v. Leech*, 11th Dist. No. 2001-L-195, 2003-Ohio-1875, ¶ 31 (the issue of whether there is immunity is a totally separate issue from whether there is proximate cause). Thus, whether her acts or omissions in fact caused damages to someone and whether that someone was properly named as a party are not immunity issues. *See Dawson v. City of Cleveland*, 8th Dist. No. 94510, 2010-Ohio-5142, ¶ 5, 10-12 (denial of summary judgment where city alleged there was no proximate cause was not denial of immunity and thus not appealable).

{¶104} Appellate review under R.C. 2744.02(C) concerns the denial of immunity, and we need not address other issues raised by the appellant regarding the request for summary judgment. *Long v. Village of Hanging Rock*, 4th Dist. No. 09CA30, 2011-Ohio-5137, ¶ 10.

{¶105} Because Ms. Vechiarelli's arguments on appeal are not based upon immunity, we refuse to address this assignment of error. *See, e.g., id.*, citing *Nagel v. Horner*, 162 Ohio App.3d 221, 2005–Ohio–3574, 833 N.E.2d 300, ¶ 21 (4th Dist.) (R.C. 2744.02(C) limits appellate review to denial of immunity and does not authorize court to review merits of the action); *Makowski v. Kohler*, 9th Dist. No. 25219, 2011–Ohio–2382, ¶ 7; *Riggs v. Richard*, 5th Dist. No. 2007CA00328, 2008-Ohio-4697, ¶ 8-15 (provision making denial of immunity final is narrowly focused allowing interlocutory appeal of only that issue).

{¶106} This position is further supported by the principle that after summary judgment is denied, further evidence can be generated at trial to fix any deficiencies from the summary judgment stage. *See Continental Ins. Co. v. Whittington* (1994), 71 Ohio St.3d 150, 156, 158, 642 N.E.2d 615 (errors in denying summary judgment can become moot or harmless after a trial). *See also Eckman v. Rammuno*, 7th Dist. No. 09MA162, 2010-Ohio-4316, ¶ 57 (Supreme Court's position is forgiving to a party

who fails to adequately factually respond to a motion for summary judgment if that party proves their case at trial).

**{¶107}** As the arguments raised by Ms. Vechiarelli on appeal do not contest the finding of a genuine issue as to her recklessness and are not based upon the denial of immunity, Ms. Vechiarelli's appeal is dismissed.

## CONCLUSION

**{¶108}** For the foregoing reasons, the judgment of the trial court denying immunity to Executive Director Denise Stewart is reversed, and judgment is entered in her favor.

**{¶109}** The trial court's decision denying immunity to Caseworker Erin Davis is reversed, and judgment is entered in her favor.

**{¶110}** Caseworker Kim Vechiarelli's appeal is dismissed as it is not based upon the denial of immunity, and the case against Ms. Vechiarelli can proceed.

Donofrio, J., concurs.
DeGenaro, J., concurs.