[Cite as *Riehm v. Green Springs Rural Volunteer Fire Dept.*, 2018-Ohio-4075.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### SENECA COUNTY

PAUL RIEHM, ADMINISTRATOR
OF THE ESTATE OF LORRI J.
RIEHM, DECEASED,

        CASE NO.  13-18-15

        PLAINTIFF-APPELLEE,

        v.

GREEN SPRINGS RURAL VOLUNTEER        **O P I N I O N**
FIRE DEPARTMENT, ET AL.,

        DEFENDANTS-APPELLANTS.


Appeal from Seneca County Common Pleas Court
Trial Court No. 16-CV-0314

Judgment Reversed and Cause Remanded

Date of Decision:   October 9, 2018


APPEARANCES:

    *Stephen D. Strang and Gary L. Nicholson* for Appellants

    *Charles E. Boyk and Wesley D. Merillat* for Appellee

**SHAW, J.**

{¶1} Defendants-appellants, Green Springs Rural Volunteer Fire Department ("GSRVFD") and Seth T. Knieriemen ("Knieriemen"), bring this appeal from the April 20, 2018, judgment of the Seneca County Common Pleas Court denying their summary judgment motions seeking immunity in a negligence, wrongful death and survival action brought by plaintiff-appellee, Paul Riehm, Administrator of the Estate of Lorri Riehm. On appeal, appellants contend that the trial court erred by denying their motions for summary judgment based on immunity.

### I. Relevant Facts and Procedural History

#### a. Parties

{¶2} GSRVFD is an Ohio non-profit corporation with its principal place of business in Green Springs, Seneca County, Ohio. Knieriemen was a member of GSRVFD.

{¶3} Paul Riehm is the husband of Lorri Riehm, who died on June 28, 2016, when she was backed over by Knieriemen while he was operating a GSRVFD "brush" truck.[1] At the time of the incident, Knieriemen was assisting with a capsized boat on the Beaver Creek Reservoir, and Lorri was taking a walk around the reservoir.

---

[1] Testimony indicated that a "brush" truck was used to "put out grass fires," and to haul smaller equipment. (Carter Depo. at 27).

*b. Incident Leading to Litigation*

{¶4} On June 28, 2016, Gary Overmyer and Charles Musser were fishing on a 12-foot aluminum boat with an electric trolling motor at the Beaver Creek Reservoir. At some point, Gary's chair broke, shifting the weight in the boat, and the boat capsized, tossing Gary and Charles into the water. Someone on the shore saw the capsized boat and called the authorities.

{¶5} There was one other boat on the reservoir at the time, on the opposite side, with two fishermen in it. An individual on the shore told the fishermen about the capsized boat, so they gathered their things and went to assist. When they reached the capsized boat, they were unable to get Gary and Charles into their boat, so they had them hang onto the side.

{¶6} GSRVFD received the call regarding the capsized boat and dispatched numerous members, including Knieriemen, to the reservoir, along with several of the department's apparatuses. Knieriemen traveled to the reservoir as a passenger in GSRVFD's "Brush 14," a Ford F-350 Super Duty, 4x4 pickup truck. Brush 14 had been modified by adding a "skid unit" in the bed of the truck, which was described as a tank and fire pump. It obstructed approximately 70 percent of the view from the rear-view mirror. A "protector," or steel-platform, was also placed on the back of the truck for firefighters to stand on when combatting field fires.

{¶7} Brush 14 contained a trailer hitch and towed a rescue boat to the reservoir. Engine 15, Engine 10, and Tanker 16 also responded to the scene, containing various members of the department.

{¶8} Upon arrival at the reservoir, Knieriemen and other members of the GSRVFD used the boat ramp on the eastern shore to launch the rescue boat. The capsized boat was near the opposite side of the reservoir from the boat ramp. Knieriemen remained ashore while two other GSRVFD members went in the rescue boat.

{¶9} Before the rescue boat reached the capsized boaters, it ran out of fuel. The firemen radioed to shore to indicate they were out of fuel, then proceeded to paddle the rest of the way to the capsized boaters. The firemen retrieved the boaters, then took them to the nearest shoreline, on the west side of the reservoir.

{¶10} GSRVFD's Chief directed members on the eastern shoreline to bring fuel to the rescue boat on the west side of the reservoir. Knieriemen and other GSRVFD members got a gas can and took Brush 14 to the top of the embankment around the reservoir to the west side. However, after arrival, they learned that they had brought the wrong fuel for the rescue boat. Still, they loaded the two rescued boaters into Brush 14 and drove back to the other side of the reservoir and dropped the boaters off with an EMS unit that had also responded to the scene. Then, the

GSRVFD members obtained the correct fuel and returned it to the rescue boat on the west side of the reservoir.

{¶11} In the meantime, the other boaters on the reservoir had tied a rope around the capsized boat and pulled it to the western shoreline. The capsized boat was not directly beside the rescue boat, however, having drifted.

{¶12} Brush 14 stopped parallel to the rescue boat when it returned with the correct fuel to the west side of the reservoir. The proper fuel was taken down to the boat. Then, Knieriemen was informed that the other GSRVFD members were having trouble removing the capsized boat from the reservoir so he brought the truck over so they could use it to pull the boat out of the water.[2] The capsized boat was still near the western shore when Brush 14 returned with the fuel can, but it was between 50 feet and 200 feet away depending on estimates of the GSRVFD members.

{¶13} Knieriemen walked back to Brush 14, which had its emergency flashers still in operation but it did not have a reverse warning siren. Knieriemen got into the vehicle, checked all three of his mirrors, and did not see anyone in front or behind him other than, "the guys - - our personnel further back here (indicating)."

---

[2] The trial court cited the deposition of Cristin Stickles, who stated that "no one" asked Knieriemen to bring Brush 14 over to assist in pulling the boat out of the water. Knieriemen testified that he could not remember if he was asked to move Brush 14. However, Michael Carter testified that there was a discussion that moving Brush 14 to assist in pulling the boat out of the water "needed to be done," and that was where Knieriemen "was going." (Carter Depo. Tr. at 62).

(Knieriemen, Depo. at 103). He then placed the truck in reverse, and drove it backwards on the embankment path at under 5 mph towards where the other GSRVFD members were working to remove the formerly capsized boat.[3] He indicated that he did not push the throttle down.

{¶14} Meanwhile Lorri Riehm was walking on the path with headphones in her ears and her cell phone out. Lorri regularly went to the reservoir to walk, and she had that evening as well. She passed Brush 14 just as Knieriemen was getting into it. One member of GSRVFD had seen Lorri walking around the rim of the reservoir, but none of the others deposed indicated that they had.

{¶15} Lorri's back was to Brush 14 as the truck reversed. Cristin Stickles, one of the GSRVFD members, noticed Lorri and saw that Knieriemen was about to back into her. He screamed for Knieriemen to stop multiple times, but by the time Knieriemen finally stopped, he had completely run Lorri over. As Knieriemen was backing up, he felt something very small in the truck, as though something shifted in the truck bed or turnout gear had fallen.

{¶16} Brush 14's back tire ran over Lorri's spine and the top of her skull. It would seem Stickles was the only GSRVFD member who saw the incident, as the other individuals in the area had their backs turned dealing with the boats in the reservoir.

---

[3] Knieriemen testified in his deposition that he did not adjust the mirrors in the truck when he got in. He testified that he was 5'10" and the previous driver was 6'2".

{¶17} Lorri died on scene as a result of her injuries.

*c. Litigation*

{¶18} On December 13, 2016, Paul Riehm, administrator of Lorri's estate, filed a complaint against GSRVFD and Knieriemen individually, alleging, *inter alia*, negligence, recklessness, respondeat superior, wrongful death, and a survival action.

{¶19} A joint answer was filed on February 24, 2017, by GSRVFD and Knieriemen asserting, *inter alia*, qualified immunity.

{¶20} A number of depositions were taken of various GSRVFD members that were on the scene, the boaters involved, and the police who investigated the matter.

{¶21} On January 18, 2018, Knieriemen filed for summary judgment, asserting immunity as an employee of GSRVFD under R.C. 2744.03(A)(6). He argued that while it was clear that Lorri's death was a tragic accident, the evidence did not establish that Knieriemen's actions were in bad faith, wanton, or reckless to remove immunity. He also requested the court dismiss the survival claim because there was no evidence of conscious pain and suffering on Lorri's behalf.

{¶22} GSRVFD filed a motion for summary judgment asserting political subdivision immunity under R.C. 2744.02(B)(1)(b). GSRVFD argued that there was no indication that Knieriemen's actions were anything beyond negligent to rise

to the level of willful or wanton, which was required to remove GSRVFD's immunity.

{¶23} On February 21, 2018, Riehm filed consolidated response to the summary judgment motions. On March 1, 2018, GSRVFD and Knieriemen both filed replies.

{¶24} On April 20, 2018, the trial court filed a judgment entry denying the appellants' summary judgment motions. The court first determined that GSRVFD was a political subdivision based on R.C. 9.60(F), which states that a private fire company providing service to a governmental entity has the same immunities and defenses that a political subdivision has under R.C. 2744.02. The trial court also determined that the harm Lorri incurred was in connection with a government function.

{¶25} The trial court then had to determine whether any exceptions to immunity applied, and one exception did apply, being R.C. 2744.02(B)(1), wherein GSRVFD would be liable for death as a result of negligent operation of any motor vehicle by their employee when the employee was within the scope of his employment. However, there was a full defense available to liability under R.C. 2744.02(B)(1)(b), which states "A member of a municipal corporation fire department or any other firefighting agency was operating a motor vehicle while engaged in duty at a fire, proceeding toward a place where a fire is in progress or is

believed to be in progress, or answering any other emergency alarm and the operation of the vehicle did not constitute willful or wanton misconduct[.]"

**{¶26}** Therefore if Knieriemen was still answering an emergency alarm and his operation of the vehicle did not constitute willful or wanton misconduct, GSRVFD would not be liable for Lorri's injuries. The trial court found that Knieriemen was answering an emergency and acting within the scope of his employment, thus GSRVFD was entitled to immunity unless Knieriemen's actions were willful or wanton. Knieriemen was individually entitled to immunity unless his acts were with malicious purpose, in bad faith, or in a wanton or reckless manner.

**{¶27}** After defining the operative terms of willful, wanton, and reckless based on precedent from the Supreme Court of Ohio, the trial court reasoned as follows.

> **There is a genuine issue of material fact regarding whether Knieriemen's actions were wanton, willful, or reckless on June 28, 2016. Defendant Knieriemen knew there were pedestrians at the reservoir. (Plaintiff's Opposition p. 23). He knew the truck had obstructed visibility out the rear. (Knieriemen Dep. At 76). He knew there were at least five (5) individuals behind the truck, yet he never advised anyone he was backing up; did not activate the siren or honk the horn to alert people. (Stickles Dep. At 39; Knieriemen Dep. At 122). He never did a walk around of the vehicle to check that it was clear. (Plaintiff's Opposition, Ex. B, RFA #44). He never requested a spotter. (Plaintiff's Opposition p. 23). He had access to a radio and never asked for guidance. (*Id.*) When asked why, he claimed there was no purpose in using a radio. (Knieriemen Dep. At 122). He claimed that providing assistance in backing up a vehicle "is not a common practice" and**

**he presumes the people behind him are watching out for him. (*Id.* at 127).**

**Defendants Green Springs RVFD and Knieriemen argue that Knieriemen checked his three mirrors before backing up and didn't see anyone. (Knieriemen Dep. At 103, 129-130). The emergency flashers were already on. (*Id.*) He then proceeded slowly, and did not even push the throttle down. (*Id.*) Reasonable minds could come to different conclusions regarding whether defendant Knieriemen's actions were wanton, willful, or reckless. Accordingly, summary judgment is not appropriate in this matter on the issue of political subdivision immunity.**

(Doc. No. 76). The trial court also determined that a genuine issue of material fact remained regarding the survival action.

{¶28} Appellants bring this appeal from the trial court's denial of their summary judgment motions, asserting the following assignments of error for our review.

**Assignment of Error No. 1**
**The trial court erred in denying appellant Green Springs Volunteer Fire Department's Motion for Summary Judgment.**

**Assignment of Error No. 2**
**The trial court erred in denying Appellant Seth T. Knieriemen's Motion for Summary Judgment.**

**Assignment of Error No. 3**
**The trial court erred in denying the dismissal of the Appellee's survival action.**

## II. Law and Analysis

### a. *Standard of Review*

**{¶29}** "Whether a party is entitled to immunity is a question of law properly determined by the court prior to trial pursuant to a motion for summary judgment." *Pelletier v. City of Campbell*, --- Ohio St.3d ---, 2018-Ohio-2121, ¶ 12, citing *Conley v. Shearer*, 64 Ohio St.3d 284, 292, 595 N.E.2d 862 (1992) and *Riscatti v. Prime Properties Ltd. Partnership*, 137 Ohio St.3d 123, 2013-Ohio-4530, 998 N.E.2d 437, ¶ 17 (noting the importance of deciding a political subdivision's entitlement to immunity before trial).

**{¶30}** The review of a summary judgment denying political-subdivision immunity is de novo and is governed by the summary-judgment standard set forth in Civ.R. 56. *Pelletier* at ¶ 13, citing *Comer v. Risko*, 106 Ohio St.3d 185, 2005-Ohio-4559, 833 N.E.2d 712, ¶ 8.

**{¶31}** The Supreme Court of Ohio explained in *M.H. v. Cuyahoga Falls*,

**Summary judgment may be granted when "(1) [n]o genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party."**

(Brackets sic.) 134 Ohio St.3d 65, 2012-Ohio-5336, 979 N.E.2d 1261, ¶ 12, quoting *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977).

### b. Political Subdivision Immunity

**{¶32}** Although GSRVFD is a private, nonprofit entity, Revised Code 9.60 provides that

> **A private fire company or private, nonprofit emergency medical service organization providing service pursuant to this section to a governmental entity in this state or another jurisdiction has the same immunities and defenses in a civil action that a political subdivision has under section 2744.02 of the Revised Code. The employees of such a fire company or emergency medical service organization have the same immunities and defenses in a civil action that employees of a political subdivision have under section 2744.03 of the Revised Code.**

Thus if GSRVFD was providing service to a governmental entity, it has the same immunities as a political subdivision, and its employees would as well.

**{¶33}** Determining whether a political subdivision is immune from tort liability pursuant to R.C. Chapter 2744 involves a familiar, three-tiered analysis:

> **"The first tier is the general rule that a political subdivision is immune from liability incurred in performing either a governmental function or proprietary function. * * * However, that immunity is not absolute. R.C. 2744.02(B); *Cater v. Cleveland*, 83 Ohio St.3d 24, 28, 697 N.E.2d 610 (1988).**
>
> **"The second tier of the analysis requires a court to determine whether any of the five exceptions to immunity listed in R.C. 2744.02(B) apply to expose the political subdivision to liability. *Id.* at 28, 697 N.E.2d 610. At this tier, the court may also**

-12-

**need to determine whether specific defenses to liability for negligent operation of a motor vehicle listed in R.C. 2744.02(B)(1)(a) through (c) apply.**

**"If any of the exceptions to immunity in R.C. 2744.02(B) do apply and no defense in that section protects the political subdivision from liability, then the third tier of the analysis requires a court to determine whether any of the defenses in R.C. 2744.03 apply, thereby providing the political subdivision a defense against liability."**

(Ellipsis sic.) *Riffle v. Physicians & Surgeons Ambulance Serv., Inc.*, 135 Ohio St.3d 357, 2013-Ohio-989, 986 N.E.2d 983, ¶ 15, quoting *Colbert v. Cleveland*, 99 Ohio St.3d 215, 2003-Ohio-3319, 790 N.E.2d 781, ¶ 7–9.

### c. First Tier Immunity Analysis

**{¶34}** The first determination that needs to be made in this case is whether GSRVFD is entitled to claim the immunities of a political subdivision. The appellee argues, contrary to the trial court's finding, that GSRVFD did not demonstrate that it was performing contractual fire protection for a governmental entity.

**{¶35}** The trial court found that GSRVFD provided fire and rescue services and that pursuant to R.C. 9.60 it was entitled to the same immunities extended to a political subdivision. The trial court also determined that the alleged harm in this case occurred in connection with a government function, reasoning that providing rescue services satisfied the governmental function.

**{¶36}** We agree with the trial court. There is no evidence in the record that GSRVFD is anything but a private, non-profit entity that provides, *inter alia*, fire

and rescue services to the area of the incident in question. Thus the evidence indicates that GSRVFD was performing contractual services for a governmental entity.

{¶37} While the appellee argues that there was no indication that GSRVFD was providing contractual "fire protection" in *this* case, the definition of "fire protection" in R.C. 9.60 includes "rescue" services, and R.C. 2744.01(C)(2)(a) similarly states that rescue services qualifies as a governmental function.[4] The trial court found that the rescue services in this case amounted to a governmental function, and we agree. Thus in the first tier analysis, GSRVFD would qualify for the immunities in R.C. 2744.02, and Knieriemen as its employee, would as well.

*d. Second Tier Immunity Analysis*

{¶38} In the second tier of the immunity analysis, we look at whether any exceptions to apply to expose the entity to liability. Revised Code 2744.02(B)(1) contains an exception that reads, "Except as otherwise provided in this division, political subdivisions are liable for injury, death, or loss to person or property caused by the negligent operation of any motor vehicle by their employees when the employees are engaged within the scope of their employment and authority." Thus there is a general exception to immunity in this case.

---

[4] Appellee seems to assert that in order to satisfy the first tier immunity analysis, GSRVFD and Knieriemen should have had to attach the contract describing precisely what services GSRVFD was contracted to provide.

**{¶39}** However, R.C. 2744.02(B)(1) also contains "full defenses to that liability." As relevant to this case, R.C. 2744.02(B)(1)(b) provides a full defense to liability if, "A member of a municipal corporation fire department or any other firefighting agency was operating a motor vehicle while engaged in duty at a fire, proceeding toward a place where a fire is in progress or is believed to be in progress, or answering any other emergency alarm and the operation of the vehicle did not constitute willful or wanton misconduct[.]"

**{¶40}** Based on this section of the Revised Code, GSRVFD would have a full defense to liability if Knieriemen was "engaged in duty at a fire," or "answering any other emergency alarm," *and* Knieriemen's operation of the vehicle did not constitute willful or wanton misconduct. The trial court found that "Knieriemen was assisting in an active emergency scene at the time of the accident[,]" summarily indicating that he satisfied the requirement to be "answering any other emergency alarm." The appellee did not file a cross-appeal regarding this finding of the trial court; however, the appellee does maintain that a denial of summary judgment is appropriate in this case as there is an issue of fact as to whether Knieriemen was answering an emergency alarm. The appellee seems to want to restrict the language in the statute; however, given that the statute provides for conduct when "engaged in duty at a fire" it would stand to reason that "answering any other emergency alarm" would encompass more than merely getting to a rescue scene. *See Campbell*

*v. Colley*, 113 Ohio App.3d 14, 20, 680 N.E.2d 201, 204 (4th Dist.1996) ("courts have interpreted the word 'emergency' broadly as it applies to the characterization of situations to which emergency personnel respond."). We see no reason to depart from the trial court's finding on this issue.[5] Thus GSRVFD would have a full defense to liability if Knieriemen's conduct was not willful or wanton.

**{¶41}** Similarly, Knieriemen individually would be entitled to immunity as an employee of a political subdivision pursuant to R.C. 2744.03(A)(6) unless his acts were manifestly outside the scope of his employment or responsibilities or his acts or omissions were not done with malicious purpose, in bad faith, in a wanton or reckless manner.

**{¶42}** The Supreme Court of Ohio has defined all of the requisite operative terms—willful, wanton, and reckless—finding that they describe different and distinct degrees of care and are not interchangeable.

**{¶43}** "Willful misconduct implies an intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposefully doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury." *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266 (2012) at paragraph 2 of syllabus.

---

[5] We would note that while at the time of the accident the capsized boaters had been rescued, their boat remained in the water *and* the other boaters on the reservoir had run out of power trying to assist.

{¶44} "Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Anderson* at paragraph 3 of syllabus.

{¶45} "Reckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson* at paragraph 4 of syllabus.

{¶46} "All three standards–willful, wanton, and reckless–describe conduct that is more than mere negligence. * * * If reasonable minds could only conclude that the employee's conduct demonstrates, at most, negligence, then summary judgment is appropriate." *Hoffman v. Gallia Cty. Sheriff's Office*, 4th Dist. Gallia No. 17CA2, 2017-Ohio-9192, ¶ 47

{¶47} The events that occurred in this case are essentially undisputed. The reservoir was a recreational area where people occasionally went to boat, fish, and walk, amongst other things. On the evening of the incident, Lorri had gone to the reservoir to walk.

{¶48} Knieriemen was at the reservoir in response to a call regarding a capsized boat.[6] After the occupants of the capsized boat were rescued, GSRVFD

---

[6] In an attempt to characterize the department as perhaps habitually negligent at the scene, appellees argue that GSRVFD actually sent a specific water rescue unit away. However, testimony indicated that the water rescue unit only arrived after GSRVFD "had already been across to the boaters." (Chief Lowe Depo. at 70).

members were still attempting to get the boat out of the water. In order to assist with pulling the boat out of the water, Knieriemen went to move Brush 14 from near the rescue boat to near the formerly capsized boat. Michael Carter, Jr., of GSRVFD testified that as Knieriemen was entering one side of the vehicle, Lorri was walking past the other side. (Carter Depo. at 64-65). Carter was down by the water at the time. Knieriemen did not walk around Brush 14 or seek a spotter.

{¶49} The emergency lights were still on in Brush 14, but it did not have an alarm for reverse at the time. Knieriemen checked all three of his mirrors, which included the rearview mirror with its obstructed view. He did not see anyone other than their personnel, then he placed Brush 14 in reverse. Knieriemen indicated he did not push the throttle down, and that he backed up at less than 5 mph.[7]

{¶50} Cristin Stickles of GSRVFD saw Lorri walking behind Brush 14 with headphones in and her cell phone out. She was "right behind the truck * * * so there wasn't like a gap or any distance in between them." (Stickles Depo. at 46). He yelled for Knieriemen to stop multiple times, but by the time he did he had run Lorri over.

{¶51} It seems evident from the facts that Knieriemen's conduct could constitute negligence; however, in order for GSRVFD to be subject to liability, his

---

[7] The officer investigating the scene testified that he saw no indication of "horseplay," that there was no indication that Knieriemen knew he would probably injure someone when backing up, and no indication that he acted recklessly. (Deputy Smith Depo. at 76-78).

conduct had to be *far* beyond negligent. His conduct had to either be willful or wanton. Willful indicates a deliberate act, which the evidence simply does not support here in any respect. Thus we must focus on wanton misconduct.

**{¶52}** Notably, by definition, wanton misconduct is the failure to exercise *any care* in a circumstance where there is a *great probability* that harm will result. There certainly was more that Knieriemen could have done in this case, but, there is no indication that he failed to exercise *any* care.

**{¶53}** Knieriemen checked all three of his mirrors and saw no one in his path, and he backed up slowly while the emergency lights were still flashing. There is no evidence that he backed up quickly or that he did so without paying any attention whatsoever to his surroundings. To the contrary, the only evidence in the record demonstrates that Knieriemen did exercise *some* care. *See Ibrahim v. City of Dayton*, 2d Dist. Montgomery No. 27699, 2018-Ohio-1318, ¶ 17 (officer who backed up car without checking behind him exercised "at least a modicum of care" by reversing at a low speed such that wanton conduct was not present); *Scott v. Kashmiry*, 10th Dist. Franklin No. 15AP-139, 2015-Ohio-3902, ¶ ("failure to heed caution still rises only to the level of negligence. * * * 'Mere negligence is not converted into wanton misconduct unless the evidence establishes a disposition to perversity on the part of the tortfeasor,' and '[s]uch perversity must be under such conditions that the actor must be conscious that his conduct will in all probability

result in injury.' (Internal quotations omitted.) *Rankin v. Cuyahoga Cty. Dept. of Children & Family Servs.,* 118 Ohio St.3d 392, 2008-Ohio-2567, 889 N.E.2d 521, ¶ 37.).

**{¶54}** This case certainly presents a tragic accident, but the immunity statutes were designed to prevent liability unless certain extreme conduct was present. The facts of this case do not rise to the level of willful or wanton conduct to subject GSRVFD to liability.

**{¶55}** The trial court seemed particularly concerned with Knieriemen's failure to walk around the vehicle or to get a spotter, things that were suggested in the standard operating guidelines for GSRVFD. However, these issues may show that Knieriemen was negligent, but they do not show that he was acting willfully or wantonly, failing to exercise *any* care. *See Argabrite v. Neer*, 149 Ohio St.3d 349, 2016-Ohio-8374, ¶ 25 (2016), quoting *O'Toole,* 118 Ohio St.3d 374, 2008-Ohio-2574, 889 N.E.2d 505, at paragraph three of the syllabus. (" '[E]vidence of a violation of departmental policy does not create a genuine issue of material fact as to whether the violator acted with malicious purpose, in bad faith or in a wanton or recklessness [sic] manner without evidence that the violator was aware that his "conduct [would] in all probability result in injury.' "). Thus we find that the trial court erred on this matter.

**{¶56}** As to Knieriemen individually, he could still be liable if his conduct constituted recklessness. Recklessness implies conduct that is substantially greater than negligence. Knieriemen's failure to follow standard operating guidelines does not establish a genuine issue of material fact as to whether there was more than negligence here, particularly where he did not see, and perhaps could not have seen, Lorri. Knieriemen's conduct could certainly be considered negligent, but not substantially greater than negligent. Therefore, we find that the trial court also erred on this issue.

**{¶57}** Based on our resolution of the second tier analysis, we need not proceed to the third tier related to GSRVFD, therefore, appellants' first assignment of error is sustained. As we have determined that Knieriemen's conduct was not reckless, appellant's second assignment of error is also sustained.

**{¶58}** In appellants' third assignment of error, they argue that the trial court erred in denying their summary judgment motion regarding a survival action. However, based on our resolution of the first and second assignments of error, we are compelled to sustain the third assignment of error as the appellants are rendered immune from liability. Therefore, the third assignment of error is also sustained.

### IV. Conclusion

{¶59} For the foregoing reasons the assignments of error are sustained and the judgment of the Seneca County Common Pleas Court is Reversed. This cause is remanded to the trial court for further proceedings consistent with this opinion.

*Judgment Reversed and*
*Cause Remanded*

**PRESTON, J., concurs.**

**/jlr**


**ZIMMERMAN, J., dissents.**

{¶60} Whether or not a political subdivision *or* its employee may *invoke* immunity under R.C. Chapter 2744 is generally a question of law. *Hoffman v. Gallia Cty. Sheriff's Office,* 4th Dist. Gallia No. 17CA2, 2017-Ohio-9192, 103 N.E.3d 1, ¶ 38. In doing so, the Ohio Supreme Court has promulgated a three-step analysis in determining a political subdivision's immunity from liability. *Cramer v. Auglaize Acres,* 113 Ohio St.3d 266, 2007-Ohio-1946, 865 N.E.2d 9, ¶ 14. However, whether a political subdivision *employee* acted with malicious purposes, in bad faith, or in a wanton or reckless manner generally is a question of fact. *Cannavino v. Rock Ohio Caesars Cleveland, L.L.C.,* 8th Dist. Cuyahoga No. 103566, 2017-Ohio-380, 83 N.E.3d 354, ¶ 26. As such, summary judgment on

immunity (under R.C. 2744.03(A)(6)(b)) is proper unless reasonable minds can only conclude that the employee (in question) did not act willfully, wantonly, maliciously, recklessly, or in bad faith. *Argabrite v. Neer,* 149 Ohio St.3d 349, 2016-Ohio-8374, ¶ 15.

{¶61} In this case, I agree with the majority that in order for GSRVFD to be held liable, Knieriemen's conduct must be willful or wanton misconduct. Even though the "line between such misconduct and ordinary negligence is sometimes a fine one depending on the particular facts of a case, it is generally recognized that such issue is for the jury to decide." *Thompson v. Smith,* 178 Ohio App.3d 656, 2008-Ohio-5532, 899 N.E.2d 1040, ¶ 43 citing *Reynolds v. City of Oakwood,* 38 Ohio App.3d 125, 127, 528 N.E.2d 578 (2nd Dist.1987). "This issue should not be withheld from the jury where reasonable minds might differ as to the import of the evidence." *Id.* Nevertheless, I agree with the majority's determination that Knieriemen's conduct was not willful or wanton, as a matter of law, under the evidence presented. Thus, summary judgment should have been granted by the trial court to GSRVFD.

{¶62} However, the majority's determination that Knieriemen's conduct was not reckless, as a matter of law (thus entitling him to personal immunity) is flawed.

{¶63} To begin, the majority has mischaracterized crucial evidence by (seemingly) relying solely on Knieriemen's testimony. Even though the majority

asserts (that) Knieriemen checked all of the mirrors of the Brush 14 truck before backing (seeing no one), a genuine issue of fact exists as to whether or not the mirrors were capable of providing Knieriemen with a *clear* view of what was behind him due to the slope of the embankment (upon which the truck was parked) and the obstruction in the bed of the truck. The majority further asserts that Knieriemen's speed, while backing up, was "less than 5 m.p.h.," despite Knieriemen's contention that he did not know either how far he travelled (backing) or how fast the truck was moving while he was driving. (*See generally,* Knieriemen Dep. Tr. at 130).[8]

**{¶64}** I agree with the trial court's determination that a genuine issue of material fact exists as to whether or not Knieriemen's conduct was reckless. "The question of whether a person has acted recklessly is almost always a question for the jury." *Mashburn v. Dutcher,* 5th Dist. Delaware No. 12 CAE010003, 2012-Ohio-6283, 14 N.E.3d 383, ¶ 48 citing *Hunter v. Columbus,* 139 Ohio App.3d 962, 970, 746 N.E.2d 246 (10th Dist.2000). In the case before us, reasonable minds could differ whether Knieriemen's voluntary decision to back Brush 14 either up or down the reservoir embankment, unaided, with questionable visibility to the rear, knowing that at least five (5) people were behind him, was in fact reckless and not merely negligent.

---

[8] In my review of Knieriemen's deposition, I note that he responded "I do not recall" or "I do not specifically recall" approximately 100 times. To this writer, credibility is a factor that should be considered.

-24-

{¶65} For that reason, I would affirm the trial court's denial of summary judgment as to Knieriemen.

{¶66} Therefore, I dissent.